262 N.J. Super. 564 (1993)
621 A.2d 532
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JESUS RODRIGUEZ, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 26, 1993.
Decided March 12, 1993.
*565 Before Judges ANTELL, DREIER and VILLANUEVA.
Roy B. Greenman argued the cause for appellant (Zulima V. Farber, Public Defender, attorney; Mr. Greenman, designated counsel, of counsel and on the brief).
Simon L. Rosenbach, Assistant Prosecutor, argued the cause for respondent (Robert W. Gluck, Middlesex County Prosecutor, attorney; Kevin A. Calamoneri, Assistant Prosecutor, on the brief).
The opinion of the court was delivered by ANTELL, P.J.A.D.
After a trial by jury, defendant was convicted of possession of a controlled dangerous substance (heroin), N.J.S.A. 2C:35-10a(1), possession of a controlled dangerous substance (heroin) with intent to distribute, N.J.S.A. 2C:35-5a(1) and N.J.S.A. 2C:35-5b(3), distribution of a controlled dangerous substance (heroin), N.J.S.A. 2C:35-5a(1) and N.J.S.A. 2C:35-5b(3), and distribution of a controlled dangerous substance within 1000 feet of school property, N.J.S.A. 2C:35-7. He now appeals.
*566 According to the State's evidence, on August 13, 1990, at approximately 7:25 p.m., Detective James Marshall of the New Brunswick Police Department observed defendant sitting next to 148 Remson Avenue. As he watched, another person, later identified as codefendant Osvaldo Santos, walked up to defendant and handed him a $20 bill. Defendant walked to 148 Remsen Avenue, returned seconds later, and handed a glassine envelope to Santos who placed it in a Newport cigarette box. Lieutenant Tirch and Detective Lesley Levine responded to Marshall's radio call for assistance and arrested defendant and Santos minutes later. Detective Levine recovered from Santos the Newport cigarette box containing the glassine envelope that was later found to contain heroin. From defendant she recovered $288 in cash. In his radio call for assistance Marshall had described defendant as wearing a short-sleeved orange tee-shirt.
Defendant testified that he was in the area to visit Anderson Torres for the purpose of discussing a job. Torres had not yet arrived home, and while defendant was speaking with Mirabel Ruiz, Torres' girlfriend, several policemen approached and frisked him. He testified that another man, evidently Santos, was arrested at the same time and placed into a police car. About five minutes later, the police returned and handcuffed defendant. Defendant also testified that he was wearing a long-sleeve black shirt with white stripes at the time of his arrest. He further asserted that all his clothes were held by the Middlesex County jail authorities while defendant was incarcerated and were returned to him after his release. Defendant also stated he wore a beard at that time.[1] Although he knew Santos from seeing him on the streets, he denied selling heroin to him that evening.
*567 Four witnesses testified on defendant's behalf. Three of the witnesses swore to defendant's good character. Of these three, two were former employers. One of the former employers, Mr. Tappen, testified that in August 1990, defendant worked for him as a maintenance man and that on August 10, 1990, he had paid defendant the sum of $235.12 in wages. He also verified that defendant was wearing a beard on August 10, 1990. The other former employer, Mr. Cabezudo, testified that defendant also worked for him part-time in his auto body shop, and that he had paid defendant $100 for three days of work during the week that defendant was arrested.
Mirabel Ruiz verified that on August 13, 1990, defendant came to see her boyfriend, Anderson Torres. She told defendant that Torres was not home yet, and asked defendant to wait for him and have dinner. While they were talking, according to Ruiz, police officers came from behind defendant and searched him. The police left the scene but returned several minutes later and placed defendant under arrest. Ruiz also supported defendant's testimony that he was wearing a dark colored shirt that evening.
Following the presentation of defendant's evidence, codefendant Santos took the stand to testify, presumably in his own defense. However, in response to his attorney's questions he testified that he was a heroin addict and that on August 13, 1990, he bought the drugs found on his person for $20 from defendant, who, he said, was wearing an orange shirt. Santos also admitted to three previous convictions for possession of drugs, once with intent to distribute.
Although defendant's attorney cross-examined Santos as to the truth of his testimony, counsel was unaware of the fact that there was then pending against Santos a complaint for possession of a controlled dangerous substance (four or five bags of heroin) with intent to distribute. That complaint had been filed just one week before the date of Santos' testimony. The prosecutor acknowledges that if it had gone to the grand jury *568 Santos would have been indicted for possession with intent to distribute within 1000 feet of school property, contrary to N.J.S.A. 2C:35-7. These facts were brought to the attention of the court on a motion for a new trial based on newly discovered evidence which was heard on the same day defendant was sentenced, April 8, 1991. At that time, counsel disclosed to the court the further fact that on February 6, 1991, the day following the jury's return of its guilty verdict against Santos and defendant, Santos entered into a plea agreement with the State as to the recently filed charge. Pursuant thereto, he was allowed to plead guilty to an accusation for simple possession of heroin on the understanding that he would not be prosecuted for the more serious school zone violation. In addition, the State agreed to recommend a custodial sentence not to exceed 180 days, to be served concurrently with any sentence he might receive for the offense of which he was convicted with defendant on February 5, 1991.
Defendant's motion for a new trial was denied. His application for a hearing to determine whether Santos' surprise testimony at the trial was given in accordance with an understanding with the prosecutor that he would receive favorable consideration on the pending school zone drug charge was also denied. The basis of defendant's argument was that had he known of the outstanding charge pending against Santos it would have been proper for him to bring this to the attention of the jury to affect the witness's credibility. Since that information would have been exculpatory, defendant argued that it was the State's obligation under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to furnish it to him after Santos testified as he did.
The State acknowledges that although the prosecutor's office knew of the pending charge against Santos, because the charge had been so recently made, the assistant prosecutor who was trying the case was unaware of it. The State vehemently denies that the favorable plea bargain given Santos the day after this trial was in any way conditioned upon Santos testifying *569 as he did. This is corroborated by Santos' attorney, who also insists that no plea bargain was entered into until after the trial.
The reasons which motivated Santos to testify against defendant during the trial were frankly stated by his attorney to the trial court at Santos' sentencing. As he said, "I felt my obligation was to my client and not to [defendant]." Accordingly, he decided to advance Santos' interest by making Santos' testimony against defendant available in a manner against which defendant would be least able to defend and with maximum benefit to the State. The plain import of what Santos' attorney told the court was that if, before trial, he had negotiated a plea bargain on the pending charge, the prosecutor would have had to reveal that fact to defendant's attorney who would then use it to discredit Santos as a witness. Thus, he decided to conceal from defendant Santos' reasonable expectation of favorable consideration from the State if he gave incriminating testimony against defendant. There cannot be the slightest doubt of Santos' attorney's plan to have his client cooperate with the State in this manner and then use his evident cooperation for plea bargaining purposes later. His exact words follow:
It was my feeling that if Mr. Santos chose to testify, his testimony may in fact be pivotal to the case of Mr. Rodriguez. And as I explained it to Mr. Santos, it was his decision entirely, that to testify would surely convict himself, and if he did testify there was a good chance that Mr. Rodriguez would end up being convicted.
It was Mr. Santos' decision entirely, although I did indicate to him that if in fact it was a perception as a result of his testimony the State was able to sustain its burden as to Mr. Rodriguez on the indictment, that perhaps sometime thereafter I would speak to the State and see if he could receive any benefit from his testimony.
But I want to make it clear that neither myself nor the prosecutor ever entered into any conversation relative to numbers, relative to time, relative to consideration being given to him in return for his testimony. Because obviously if we had done that prior to his testimony, [defendant's attorney] certainly would have been entitled to it because obviously it would be a very fruitful area for cross-examination purposes. And that is precisely one of the reasons that I chose to stay away from any intrial negotiation relative to the accusation that he ultimately pled to or to the indictment that he was then on trial for.
*570 The State calls to our attention the fact that on the morning of trial, court and counsel were engaged in colloquy concerning Santos' whereabouts. The subject came up again when Santos was present in court. In the course of its comments, the court stated the following: "He'll be in the Workhouse in connection with an unrelated matter." From this, the State argues that defendant's attorney should have been alerted to the probability that Santos would be seeking favorable consideration for some undivulged charge.
It is clear that if the State had called Santos as a witness against defendant, defendant would have been entitled to cross-examine him about his expectations with respect to the charge pending against him. For a conviction of the school zone violation under N.J.S.A. 2C:35-7, a crime of the third degree, Santos was punishable by imprisonment for up to five years with a mandatory three-year period of parole ineligibility. Moreover, had the State moved to have him sentenced as a persistent offender to an extended term under N.J.S.A. 2C:44-3 and N.J.S.A. 2C:43-7a(4), he would have been exposed to a custodial term of between five and ten years and a parole ineligibility period of five years. These sentencing possibilities would have been highly relevant to the witness's motive in testifying insofar as it bore upon his credibility. See Alford v. United States, 282 U.S. 687, 691-92, 51 S.Ct. 218, 219, 75 L.Ed. 624, 627-28 (1931); State v. Spano, 69 N.J. 231, 235, 353 A.2d 97 (1976); State v. Taylor, 49 N.J. 440, 448, 231 A.2d 212 (1967); State v. Mathis, 47 N.J. 455, 468-69, 221 A.2d 529 (1966), rev'd on other grounds 403 U.S. 946, 91 S.Ct. 2277, 29 L.Ed.2d 855 (1971), reh'g denied 404 U.S. 876, 92 S.Ct. 31, 30 L.Ed.2d 125 (1971); State v. Curcio, 23 N.J. 521, 526-27, 129 A.2d 871 (1957); State v. Baker, 133 N.J. Super. 394, 396-97, 336 A.2d 760 (App.Div. 1975); State v. Zwillman, 112 N.J. Super. 6, 18-19, 270 A.2d 284 (App.Div. 1970), certif. denied, 57 N.J. 603, 274 A.2d 56 (1971); Annotation, "Preventing or Limiting Cross-Examination of Prosecution's Witness as to His Motive for Testifying," 62 A.L.R.2d 610, 630 at § 5[a] (1958). Had Santos *571 testified as a State's witness, the prosecutor's office would have had a responsibility to be aware of the recently filed complaint against him. "Due process requires that the State disclose information it possesses which is material to the defense, even where it concerns only the credibility of a State's witness." State v. Spano, supra, 69 N.J. at 235, 353 A.2d 97.
We are unable to differentiate in any legally significant way the consequences of what happened in the case presented from those in which the incriminating witness was proffered by the State. In this case, defendant supported his denial of the charge with the testimony of witnesses that might well have created a reasonable doubt in the mind of the jury. The evidence of guilt was far from overwhelming. The only controlled dangerous substance offered in evidence was what was taken from Santos. Nothing was found on defendant's person; nor was any supply discovered at the location from which the State contends defendant obtained the drug given to Santos. From the evidence, the jury could reasonably have questioned whether the man in the orange tee shirt whom Detective Marshall observed and the defendant, who claims to have been wearing a long-sleeve black shirt, were one and the same. In this state of the proofs, the testimony of Santos, who was sympathetically presented as a repentant miscreant, interested only in confessing his own guilt and telling the truth about defendant, must have been weighed by the jury with lethal effect. Had the jury known of Santos' ulterior motives, it might well have decided differently.
While we appreciate Santos' attorney's sense of obligation to his client, we cannot close our eyes to his frank acknowledgment that in order to curry favor with the State he deliberately pursued a strategy calculated to deny defendant his constitutional right to due process of law. That the State was not shown to have contributed to the process (beyond failing to inform defendant's attorney of the recent charge against Santos) is immaterial. Regardless of how responsibility should be *572 allocated, it is evident to us that in this case the system failed to afford defendant a fair trial.
We decline to speculate on what inferences defendant's attorney should have drawn from the trial court's laconic observation about Santos being "in the Workhouse in connection with an unrelated matter." Regardless of what may have been preoccupying counsel's mental processes at that moment, it is evident that he was completely surprised by Santos' testimony and was unable to utilize the fact of Santos' recent arrest in cross-examining that witness.
Reversed and remanded for a new trial.
NOTES
[1] The police witnesses could not recall whether or not defendant was wearing a beard when they arrested him.