754 A.2d 623 (2000)
333 N.J. Super. 119
STATE of New Jersey, Plaintiff-Respondent,
v.
Carmine RUSSO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 9, 2000.
Decided July 18, 2000.
*626 Alan L. Zegas, for defendant-appellant (Alan L. Zegas, attorney; Michael Critchley, attorney; DeCotiis, Fitzpatrick & Gluck, Teaneck, attorneys; Mr. Zegas, Sharon B. Kean, Mr. Critchley, Alfred C. DeCotiis, Teaneck and William R. Lundsten, on the brief).
Paul J. Bradley, Assistant Prosecutor, for plaintiff-respondent (Donald C. Campolo, Acting, Essex County Prosecutor, attorney; Mr. Bradley, of counsel and on the brief).
Before Judges KESTIN, WEFING and STEINBERG. *624
*625 The opinion of the court was delivered by STEINBERG, J.A.D.
Defendant Carmine Russo appeals from an order denying his motion for a new trial and his petition for post-conviction relief. We reverse and remand.
Russo was a member of the Newark Police Department, having attained the rank of lieutenant. He and Detectives Victor Jorge and Carmine Buonsanto were indicated in a multi-count indictment, charging them with various offenses arising out of an alleged assault which occurred during the course of an arrest of Thomas Harris. The incident occurred in May 1995.
Shortly before trial the State dismissed the charges against Jorge and Buonsanto, and downgraded the aggravated assault charge against Russo to a disorderly persons offense charging simple assault, N.J.S.A. 2C:12-1(a)(1) and N.J.S.A. 2C:12-1(a)(3). The simple assault charge was bench-tried before the Superior Court judge to whom the indictment had been assigned for trial.
At trial the State presented the testimony of Susan Benedetto, who worked on the second floor of a building at 182 Roseville Avenue in Newark. She said that on March 15, 1995, she was in a back room having lunch when she heard "a lot of noise and commotion out in the back of the next door building". She looked out the *627 window and saw two police officers arresting the victim, Thomas Harris. She identified defendant as one of the officers. Initially, she saw the officers "[g]rabbing the man, patting him, ... yelling at him and then they took him to between the two cars that were parked along the fence, searched him well, handcuffed him, dropped him to his knees, head up against the car, and then they continued tothen they left him there, started searching the area". She said Russo kept yelling "[w]here is it, where is it?". According to Benedetto, the victim did not attempt to resist the arrest, or struggle with the officers. She said he was handcuffed, with his hands behind his back. She testified that officers left to search the area. When they returned, the victim was kneeling against the car and defendant went over to him, "approached him on his right side, started screaming at him again, `where is it, where is it'". The victim did not respond. She also said the victim did not struggle, or attempt to flee. She asserted that defendant picked up his right foot and kicked the victim "with a strong enough blow to really kick the man over. He kicked his right shoulder, and then the man fell on his left side, rolled onto his back, and with that, [defendant] stomped on his chest". She said defendant "stomped [the victim] so hard the man shook". She called 9-1-1, was referred to Internal Affairs, and advised Officer Cardone what was transpiring. She said the victim had a white sweatshirt on, and "there was a big footprint right on his chest, Lieutenant Russo's footprint". She claimed her view was unobstructed. She also said Mary Clair Scerbo, Robin Lightner, and perhaps one or two other people were present, although they were facing away from the window.
The State then presented the victim's testimony. He claimed he was walking down Roseville Avenue when he saw the police pass by in "some type of Jeep or Cherokee-like Jeep, staring at him `kind of funny' ". He said they got out of the Jeep and began to chase him. He ran to a back yard, and attempted to hide because he had outstanding warrants. He was found by an officer who handcuffed him. He said he was on the ground, handcuffed, and never resisted, struggled or fought with the officers. He was handcuffed behind the back. He said defendant "came like he wanted trouble" and either pushed him or punched him to the ground. He said defendant "got ... directly on my chest, both his feet," and asked where the drugs were. He said defendant was "stomping" on his chest, "not ... hard ..., but he was stomping on me to let me know he means business".
The victim conceded that he spoke to someone from Internal Affairs at the police station and said that he had not been assaulted. According to the victim, he made that statement because defendant and the other officers had advised him that if he denied being assaulted he would be immediately released. The victim testified that he was processed immediately, and released within ten minutes after he arrived at the station.
The State also presented Scerbo as a witness. She said she looked out the window, and saw two "white males searching at that particular time". She also saw a "black male" between two cars. She could not determine if he was handcuffed. She never saw "the black male attempt to flee". In addition, he was not struggling. She said she was called away and as she was walking she heard Benedetto say "oh, my God, they are kicking him".
Defendant testified that he was traveling in a Jeep on Roosevelt Avenue with Buonsanto and Jorge when they were stopped by a citizen who told them "that there was a guy with a gun by the phone booth ... on Roosevelt Avenue about three-quarters of a block behind us". Defendant was seated in the backseat. They made a U-turn and suddenly Jorge jumped out of the vehicle. Defendant followed him. He heard Jorge and Buonsanto say something about a "drug deal going down". He said *628 the victim fled and he and Jorge pursued him. Jorge apprehended the victim and defendant observed them struggling. Defendant said the victim was cuffed and "put with his knees [sic] crossed behind his back ... in a kneeling position". He and Jorge began to search for the drugs and the gun. He heard a movement, and turned and saw the victim "attempting to get up". He went toward the victim, grabbed him, and pushed him down telling him not to move. He denied kicking the victim or stomping on his chest.
Jorge testified that as they approached the telephone booth he observed "a black male [who] fit the description. He looked like he was passing off what appeared to us upon investigation to be passing CDS to a black female". He said as he opened the door to get out of the Jeep the victim began to flee into a rear yard. He saw the victim crouched between a van and a fence. According to Jorge, the victim had something in his hands which he dropped and then began to run to the back of the yard. Jorge pursued him and apprehended him. He said the victim struggled. He said he handcuffed the victim. Russo arrived and they began to search the area. Jorge said he found packets. He heard something and turned and saw the victim attempting to get up. Defendant grabbed the victim and pushed him back down.
Buonsanto testified that he remained in the Jeep, and drove it around the block to get behind the area in case the victim was "running through" attempting to "get out the back way". He then drove back to the original location and saw defendant "holding on to the suspect". He approached and Russo gave him "custody of the suspect and advised [him] to place [the suspect] in the back of the Jeep".
The Law Division judge found defendant guilty, relying principally upon Benedetto's testimony. In making his findings, the judge said:
I don't make those findings lightly.
It frankly pains me to do so, and I agree with the prosecutor that frankly were it not for the testimony and evidence presented by Ms. Benedetto, if this were a case where I had to decide between the credibility of Mr. Harris alone, as opposed to that of not just Lt. Russo but the other officers who were there, I probably would not have been able to conclude as I have, but there is a lot more here than just the uncorroborated testimony of a man like Mr. Harris.
The judge imposed a $500 fine. In addition, he imposed the appropriate monetary penalties and assessments. Finally, he concluded that since defendant had been convicted of an offense involving and touching upon his public "office, position or employment" defendant must forfeit his public office. N.J.S.A. 2C:51-2.
On May 22, 1997, approximately three months after defendant had been found guilty, the assistant prosecutor who had tried the case forwarded to new counsel for defendant a copy of an administrative report submitted by Special Agent Louis Portella of the Essex County Prosecutor's Office. According to Portella, in late 1995, prior to defendant's trial, he had met with the victim who wanted to become an informant. He said the victim told him "the cops didn't beat me, they want me to say that they did". Portella said he told the victim "when you go to court don't lie just tell the truth". According to Portella, the victim answered "I have to live out here with these cops". Apparently, Portella never communicated that conversation to anyone until after defendant had been found guilty.
After defendant's trial, he retained new defense counsel as well as the services of an investigator. His investigator learned that Benedetto had been discharged from her employment because she had lied regarding her educational background; falsified her resume; fabricated a transcript; fraudulently declared that she had taken courses she had, in fact, never taken, and fraudulently claimed to have received degrees and honors. According to defense *629 counsel, the investigator ascertained that Benedetto had lied about her address to a state agency in order to prevent her former husband from seeing his children; had smoked marijuana; had suffered from unexplained blackouts, and had been charged with a disorderly persons offense. According to defendant, this evidence would have been admissible in an effort to impeach Benedetto's credibility.
Prior to trial, as part of the discovery process, defendant specifically requested a photograph taken of the victim taken shortly after his arrest. The trial prosecutor claimed that the photograph had been "inadvertently destroyed", attempting at trial to blame defendant for its disappearance. The prosecutor claimed that Newark police officer Tytriyanta Hicks advised him that the roll of film containing the victim's photograph was damaged and, accordingly, the photograph did not appear on the roll.
Post-trial, Hicks supplied a certification explaining that she had no recollection of ever speaking with the prosecutor or anyone else from the prosecutor's office about the photograph. She stated that she had no idea whether a photograph of the victim was lost or destroyed and that if she had any information of that nature she would have submitted a report to her supervisor. She also stated she was never interviewed by defendant's attorney. Hicks' certification was attached to defendant's brief in support of his petition for post-conviction relief and his motion for a new trial. In its responding brief, the State disclosed that the photographs had been discovered when preparing a response to the petition.
In addition, Lieutenant Anthony Ambrose of the Newark Police Department certified that he had attended a meeting with the assistant prosecutor and others and observed the assistant prosecutor remove the photograph from his folder.
Submitted with defendant's motion for a new trial and petition for post-conviction relief were the certifications of a number of persons who had knowledge of potentially exculpatory evidence. Jackie Finch certified that at the time of the incident he was the director of a shelter located at 176 Roosevelt Avenue, "nearly adjacent to the place of the ... offense". He said he had been interviewed prior to trial by an investigator engaged by Jorge and told the investigator he had "witnessed the incident... and never, at any time, throughout the course of the incident, observed any of the police officers mistreating [the victim]".[1]
Officer Louis Santiago certified that he was never interviewed by defendant's attorney and was never called as a witness. He said he was the officer who transported the victim to the police station. He said he would have testified that the victim was not injured; did not complain of any injuries, and did not have any footprints on his clothing.
Buonsanto also provided a certification stating that defendant never kicked or mistreated the victim; the victim did not have a footprint impression on his clothing, and that the victim made no complaints at the police station about being mistreated, kicked or assaulted by defendant. In addition, Jorge provided a certification stating that he did not recall being interviewed by defendant's attorney before he took the stand and was never asked whether the victim's clothing contained footprint impressions. Had he been asked, he would have testified that there were none. Moreover, he would have testified that he saw no injuries on the victim, and the victim never requested medical treatment.
Officer Rocco Bonassissa certified that he took the "gallery photo" of the victim.
*630 He said the victim had no injuries and complained of no pain. Moreover, he certified that the victim's clothing contained no footprint impressions. He said the victim's photograph would have shown evidence of footprints or blood if they existed on his person or clothing.
Lieutenant William Capra certified that he had been asked by defendant to interview the victim regarding the alleged assault. He said he was not interviewed by defendant's attorney before he testified. He said he spoke to the victim on the day of the arrest and the victim's clothing contained no footprint markings; the victim made no complaints about being mistreated, kicked or assaulted, and the victim's body, which he examined with his shirt off, did not reflect any injury. The victim did not request medical treatment. He claimed defendant's attorney did not question him regarding those issues.
Bobby McQueen certified that he was working as an intake officer when the victim was processed at the Prisoner Processing Division of the Newark Police Department. He said that although the victim was brought in at 4:10 p.m., and he was advised at 4:30 p.m. that the victim was to be released on his own recognizance, the identification process did not conclude until 11:10 p.m. He said the victim "was never handled in any unusual manner, he received no special treatment and was processed in routine fashion". In addition, he said the victim did not complain of, or exhibit, any injuries and never stated he had been mistreated. He said he was never questioned by defense counsel and was never subpoenaed to testify at trial.
Lieutenant James O'Connor certified that he worked at the Prison Detention Bureau on May 15, 1995, and that the victim was at the cellblock longer than two hours and twenty minutes, and never complained of pain, or appeared to be injured. O'Connor also said he was never interviewed by defense counsel.
Defendant also supplied the certification of Thomas Paranzine, a private detective who took photographs of the scene. He claimed the photographs revealed that Benedetto could not observe the area where the victim was arrested from the vantage point she had disclosed.
Detective Gary Bootes certified that he responded to the scene as a back-up. He said the victim recognized him and called out "Gary". He also said the victim said that if Bootes could get him released he would work with the police and provide information about drug activities. He said the victim was standing two feet away and did not look as if he had been mistreated. In addition, he certified that the victim did not complain about any injuries or ask for medical attention. Finally, he said there were no footprints or any impressions on the victim's shirt. He said he was never contacted by defense counsel.
Defendant also contended that the State's file contained exculpatory material that was not turned over to him. Specifically, defendant contended that the information was contained in a memorandum of Assistant Essex County Prosecutor Gary Bogdanski (the Bogdanski memorandum). He asserted that the Bogdanski memorandum contained information that: (1) the victim sustained no injury during the assault; (2) no corroboration existed to support the victim's allegations that he was told that if he did not report the assault to an Internal Affairs Officer he would be released on his own recognizance; (3) the release of the victim on his own recognizance was consistent with all policies of the prosecutor's office; (4) three other independent witnesses who saw the arrest denied that they saw an assault upon the victim, and (5) the victim had a drug problem, and was inconsistent in his accounts of the assault made to law enforcement officers. The judge concluded that even assuming the facts asserted were contained in the Bogdanski memorandum, the outcome of the trial would not have been affected, and refused to review it in-camera.
*631 On this appeal, defendant raises the following arguments:
POINT I THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL WHERE, AS HERE, IT IS CLEAR THAT IN VIOLATION OF DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL, THE STATE WITHHELD FROM DEFENDANT MATERIAL EVIDENCE AND STATEMENTS THAT DIRECTLY EXCULPATED DEFENDANT AND IMPLICATED OTHERS IN AN OBSTRUCTION OF JUSTICE. AT MINIMUM, DEFENDANT WAS ENTITLED TO A HEARING ON THIS MATTER.
POINT II THE TRIAL COURT ERRED IN DENYING DEFENDANT'S PETITION FOR POST-CONVICTION RELIEF OR, AT MINIMUM, HOLDING A HEARING WHERE, AS HERE, DEFENDANT'S TRIAL ATTORNEY'S FAILURE TO INVESTIGATE OBVIOUS SIGNIFICANT AVENUES OF DEFENSE, INCLUDING THE INTERVIEWING AND CALLING OF EYE-WITNESSES AND OTHERS WHO WOULD HAVE DIRECTLY EXCULPATED DEFENDANT, UTTERLY DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL, TO DUE PROCESS, AND TO A FAIR TRIAL.
POINT III THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANT'S MOTION FOR A NEW TRIAL, OR AT MINIMUM, CONDUCT A HEARING WHERE NEWLY DISCOVERED EVIDENCE PRESENTED TO THE COURT ESTABLISHES THAT DEFENDANT WAS UNFAIRLY CONVICTED IN VIOLATION OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL.
We first consider defendant's contention that the trial judge erred in denying his motion for a new trial based upon his contention that the State withheld material evidence and statements that directly exculpated defendant and implicated others in an obstruction of justice. Alternatively, defendant contends that he was entitled to an evidentiary hearing.
It is well-settled that the suppression by the prosecution of evidence favorable to a defendant violates due process of law where the evidence is favorable to the defense, and is material. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215, 218 (1963); State v. Martini, 160 N.J. 248, 268-69, 734 A.2d 257 (1999); State v. Nelson, 155 N.J. 487, 497, 715 A.2d 281 (1998), cert. denied, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 788 (1999). In order to establish a Brady violation, defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material. Martini, supra, 160 N.J. at 268-69, 734 A.2d 257; Nelson, supra, 155 N.J. at 497, 715 A.2d 281. Exculpatory evidence includes not only material that is directly exculpatory of a defendant, but also evidence that may impeach the credibility of a State witness. State v. Spano, 69 N.J. 231, 235, 353 A.2d 97 (1976); State v. Vigliano, 50 N.J. 51, 60, 232 A.2d 129 (1967); State v. Nelson, 330 N.J.Super. 206, 213-15, 749 A.2d 380 (App. Div.2000); State v. Rodriguez, 262 N.J.Super. 564, 570-71, 621 A.2d 532 (App.Div. 1993); State v. Laganella, 144 N.J.Super. 268, 282, 365 A.2d 224 (App.Div.), appeal dismissed, 74 N.J. 256, 377 A.2d 652 (1976). The materiality standard is satisfied if defendant demonstrates that there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. United States v. Bagley, 473 *632 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985); State v. Nelson, supra, 330 N.J.Super. at 214, 749 A.2d 380. Stated another way, the question is whether in the absence of the undisclosed evidence did the defendant receive a fair trial which is understood as a trial resulting in a verdict worthy of confidence. Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490, 506 (1995); State v. Martini, supra, 160 N.J. at 269, 734 A.2d 257; State v. Nelson, supra, 330 N.J.Super. at 214, 749 A.2d 380. If the undisclosed evidence was merely cumulative or repetitious as to the purpose for which it could have been used, the conviction should not be set aside. State v. Marshall, 123 N.J. 1, 206, 586 A.2d 85 (1991), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993); State v. Carter, 91 N.J. 86,114, 449 A.2d 1280 (1982); State v. Conway, 193 N.J.Super. 133, 175, 472 A.2d 588 (App.Div.), certif. denied, 97 N.J. 650, 483 A.2d 174 (1984).
In determining whether there is a reasonable probability that the result of defendant's trial would have been different had the suppressed evidence been disclosed, we must look to the aggregate of the evidence suppressed, rather than view in isolation the impact of each discrete item withheld. State v. Knight, 145 N.J. 233, 248, 678 A.2d 642 (1996); State v. Landano, 271 N.J.Super. 1, 43, 637 A.2d 1270 (App.Div.). certif. denied, 137 N.J. 164, 644 A.2d 612 (1994). In addition, the issue of materiality is a mixed question of law and fact. Landano, supra, 271 N.J.Super. at 36 n. 13, 637 A.2d 1270. Therefore, the Law Division judge's conclusion regarding whether defendant sustained his burden of proof is not entitled to the same deference as his factual findings. Id. at 31 n. 10, 637 A.2d 1270.
Here, the evidence claimed to have been suppressed is (1) the Bogdanski memorandum, (2) the Portella report, and (3) the photograph of the victim taken at the time of his arrest. In denying the motion for a new trial, the judge felt the Portella report was cumulative since the victim had conceded, on cross-examination, that he told the investigator from Internal Affairs, shortly after his arrest, that he had not been assaulted. We disagree. According to the victim, he denied the assault to the investigator because defendant had assured him that if he denied an assault he would immediately be released. The statement made to Portella was made long after his release and, consequently, was not motivated by a desire to be quickly released. The fact that the trial prosecutor was unaware of Portella's conversation with the victim is of no consequence. To be sure, the Brady disclosure rule applies only to information of which the prosecution is actually or constructively aware. State v. Nelson, supra, 155 N.J. at 498, 715 A.2d 281. However, since Portella was a Newark police officer, his knowledge is imputed to the Newark Police Department and the Essex County Prosecutor's Office. Id. at 499-500, 715 A.2d 281.
In addition, the judge should have reviewed the Bogdanski memorandum incamera, redacted any information that may be privileged or work-product, and turned over to the defense any discoverable, exculpatory material.
We note our agreement with the judge's assessment of the photograph. It contained a placard obscuring the view of the victim's shirt. Accordingly, since the shirt could have had footprints as testified to by Benedetto that were obscured by the placard, the photograph was not material.
On remand, the judge should consider the Bogdanski memorandum, mark it into evidence, make a record of the results of his in-camera review, and then seal the memorandum and his conclusions so they are not available for public scrutiny, yet are available for appellate review. In addition, an evidentiary hearing should be conducted regarding what Portella knew, and when he knew it. Of course, the parties are free to introduce other evidence that may have relevancy regarding *633 the application for a new trial based upon defendant's contention that the State withheld exculpatory material.[2]
Defendant's motion for a new trial was also based upon his contention that newly discovered evidence entitled him to that relief. It is well-settled that newly discovered evidence warrants a new trial only if the evidence is (1) material to the issue and not merely cumulative, impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the fact-finder's verdict if a new trial were granted. State v. Bey, 161 N.J. 233, 287, 736 A.2d 469 (1999), cert. denied, ___ U.S. ___, 120 S.Ct. 2693, ___ L.Ed.2d ___ (2000); State v. Carter, 85 N.J. 300, 314, 426 A.2d 501 (1981); State v. Henries, 306 N.J.Super. 512, 529, 704 A.2d 24 (App.Div. 1997). In addition, a motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown. State v. Artis, 36 N.J. 538, 541, 178 A.2d 198 (1962); State v. Smith, 29 N.J. 561, 573, 150 A.2d 769, cert. denied, 361 U.S. 861, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959); State v. Henries, supra, 306 N.J.Super. at 529, 704 A.2d 24; State v. Conway, supra, 193 N.J.Super. at 172, 472 A.2d 588. Here, most of the evidence that has been subsequently discovered could have been discovered prior to trial. Indeed, defendant argues that his attorney was ineffective in failing to conduct a proper investigation. The only new evidence that was not discoverable by reasonable diligence before the trial was the photograph of the victim and the Bogdanski memorandum. Again, the judge should consider that evidence and determine whether it is of the sort that would probably change his verdict and ultimately determine whether he should grant a new trial, as well, on the ground of newly discovered evidence. Although the authorities we have relied upon are cases involving jury verdicts, we discern no reason why a different standard should apply to a collateral attack upon a verdict rendered after a bench trial.
We next address defendant's contention that he was denied the effective assistance of counsel. Under certain circumstances, a person convicted of an offense may seek to collaterally attack that conviction by filing a petition for postconviction relief. R. 3:22-1 to -12; R. 7:10-2. Post-conviction relief is New Jersey's analogue to the federal writ of habeas corpus. State v. Afanador, 151 N.J. 41, 47, 697 A.2d 529 (1997); State v. Preciose, 129 N.J. 451, 459, 609 A.2d 1280 (1992); State v. Cummings, 321 N.J.Super. 154, 164, 728 A.2d 307 (App.Div.), certif. denied, 162 N.J. 199, 743 A.2d 852 (1999). A petitioner must establish the right to such relief by a preponderance of the credible evidence, Preciose, supra, 129 N.J. at 459, 609 A.2d 1280; State v. Mitchell, 126 N.J. 565, 579, 601 A.2d 198 (1992). Ineffective assistance of counsel claims are particularly suited for post-conviction review because they involve allegations and evidence that lie outside the trial record and, therefore, often cannot reasonably be raised in a prior proceeding. Preciose, supra, 129 N.J. at 460, 609 A.2d 1280.
Although R. 3:22-1 does not require evidentiary hearings to be held on *634 post-conviction relief petitions, R. 3:22-10 recognizes judicial discretion to conduct such hearings. State v. Marshall, 148 N.J. 89, 157, 690 A.2d 1, cert. denied, 522 U.S. 850, 118 S.Ct. 140, 139 L.Ed.2d 88 (1997); Preciose, supra, 129 N.J. at 462, 609 A.2d 1280. Ordinarily, a post-conviction relief court should grant an evidentiary hearing to a defendant who has presented a prima facie case in support of his application. Marshall, supra, 148 N.J. at 158, 690 A.2d 1; Preciose, supra, 129 N.J. at 462, 609 A.2d 1280. To establish a prima facie case, defendant must demonstrate a reasonable likelihood that his or her claim will ultimately succeed on the merits. Marshall, supra, 148 N.J. at 158, 690 A.2d 1; Preciose, supra, 129 N.J. at 463, 609 A.2d 1280. Moreover, in determining whether to grant an evidentiary hearing, the post-conviction-relief court must consider the facts in the light most favorable to defendant to determine whether a defendant has established a prima facie claim. Marshall, supra, 148 N.J. at 89, 690 A.2d 1, Preciose, supra, 129 N.J. at 462-63,609 A.2d 1280; State v. Garcia, 320 N.J.Super. 332, 338, 727 A.2d 97 (App.Div.1999). If there are disputed issues as to material facts regarding entitlement to post-conviction-relief, a hearing should be conducted. State v. Pyatt, 316 N.J.Super. 46, 51, 719 A.2d 674 (App.Div.1998), certif. denied, 158 N.J. 72, 726 A.2d 936 (1999).
The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674, 692 (1984); State v. Fisher, 156 N.J. 494, 499, 721 A.2d 291 (1998). In order to prevail on an ineffective assistance of counsel claim, defendant must establish that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. Strickland, supra, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; Fisher, supra, 156 N.J. at 499, 721 A.2d 291; State v. Fritz, 105 N.J. 42, 53-58, 519 A.2d 336 (1987). If defendant satisfies the first prong of the test, he must also establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, supra, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698, Fisher, supra, 156 N.J. at 500, 721 A.2d 291; Fritz, supra, 105 N.J. at 52, 519 A.2d 336. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Ibid. The failure to conduct an adequate pre-trial investigation may give rise to a claim of ineffective assistance of counsel. Preciose, supra, 129 N.J. at 464, 609 A.2d 1280; State v. Savage, 120 N.J. 594, 621-22, 577 A.2d 455 (1990) (only those strategic choices made after thorough investigation are virtually unchallengeable); State v. Davis, 116 N.J. 341, 357, 561 A.2d 1082 (1989) (same). The American Bar Association Standards, The Defense Function § 4.1 (1971) provides, as follows: "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty." Relying on that standard, the Third Circuit has held that a defendant is entitled to a complete and vigorous defense, requiring counsel, at the very least, to investigate all substantial defenses available to a defendant. United States v. Baynes, 687 F.2d 659, 668 (3d Cir.1982). We agree; inadequate pre-trial investigation may form the basis of an ineffective assistance of counsel claim.
In denying the petition for post-conviction relief, the judge noted that defendant's attorney presented a vigorous defense. He concluded that most of the certifications were merely cumulative to the witnesses who were called. In addition, he stated that the certifications included "completely irrelevant testimony". Finally, he said he did not find "anything *635 that would have had any chance of changing the result of this proceeding".
As in a motion for new trial, we acknowledge that we must give deference to the trial judge's feel for the case since he presided over the trial, especially when he was the fact-finder, and had the opportunity to observe and hear the witnesses as they testified. However, we conclude that as in a motion for new trial, the question as to whether the result of the proceeding would have been different is a mixed question of law and fact. We recognize that we must give substantial deference to the factual decisions of the trial judge and are restricted to the test of "whether the findings made [by the trial court] could reasonably have been reached on sufficient credible evidence present in the record". State v. Locurto, 157 N.J. 463, 472, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). However, the trial judge's interpretation of the law is not entitled to such deference. In Re J.W.D., 149 N.J. 108, 117, 693 A.2d 92 (1997); State v. Brown, 118 N.J. 595, 604, 573 A.2d 886 (1990); State v. Bruno, 323 N.J.Super. 322, 331, 732 A.2d 1136 (App.Div.1999); State v. Cryan, 320 N.J.Super. 325, 328, 727 A.2d 93 (App.Div.1999). With these principles in mind, we conclude that if a prima facie showing of ineffective assistance of counsel has been made, even a judge who has conducted a bench trial may not assume that the proffered evidence does not create a reasonable probability that the result of the proceeding would have been different. The judge can only make that determination after conducting the necessary evidentiary hearing, hearing the evidence, and then making a qualitative judgment as to whether that evidence, after being subjected to cross-examination, is sufficient to engender a reasonable probability that the result of the proceeding would have been different, or that the evidence presented at the hearing was sufficient to undermine confidence in the outcome of the initial trial.
Finally, we must consider whether the proffered evidence was sufficient to constitute a prima facie showing of ineffective assistance of counsel. In order to establish a prima facie case, defendant must demonstrate a reasonable likelihood that his or her claim will ultimately succeed on the merits. State v. Marshall, supra, 148 N.J. at 158, 690 A.2d 1. Here, we readily conclude that the totality of the proffered evidence was sufficient to demonstrate a reasonable likelihood that defendant's claim would succeed on the merits. The proffered evidence, if believed, creates doubt as to whether Benedetto, who the judge principally relied upon in finding defendant guilty, was able, from her vantage point, to see the incident. Moreover, the victim's statement to Portella, if believed, raises a serious question as to whether he was ever assaulted. Furthermore, the proffered evidence that the victim displayed no bruises, did not appear in pain or distress, and never asked for medical assistance, also brings into question whether an assault occurred. In sum, we conclude that the proffered evidence, if credible, was sufficient to demonstrate a reasonable likelihood that defendant's claim would ultimately succeed on the merits. Accordingly, the judge should have granted an evidentiary hearing.
Reversed and remanded for further proceedings not inconsistent with this opinion.
NOTES
[1] We note that defendant also contends that Robin Lightner, a fellow employee of Benedetto, should have been called. However, defendant provided no certification of Lightner regarding her anticipated testimony. Accordingly, we do not consider in our opinion the anticipated testimony referred to defendant's brief, since it is not supported by a certification.
[2] For guidance of the parties on remand, we note our basic agreement with the judge's conclusions regarding the admissibility of the proffered impeachment evidence of Benedetto. However, we cannot make a definitive determination regarding the admissibility of the impeachment evidence since the judge did not rule separately on each proffer. On remand, the judge should rule specifically on each discrete item or evidence offered, and if deemed relevant, should decide the impact of that decision on the overall question of defendant's entitlement to a new trial. Moreover, the judge, on remand, should consider all other evidence that has potential impeachment value as to Benedetto, determine its admissibility and importance in making the ultimate decision as to defendant's entitlement to a new trial.