**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5282-18T2

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

LAQUAN H. HARRIS,
a/k/a QUAN, and Q,

     Defendant-Respondent.

_____

Argued February 27, 2020 – Decided June 8, 2020

Before Judges Alvarez and Suter.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Union County, Indictment No. 10-07-0752.

Michele C. Buckley, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for appellant (Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney; Michele C. Buckley, of counsel and on the briefs).

John Andrew Albright, Designated Counsel, argued the cause for respondent (Joseph E. Krakora, Public

Defender, attorney; John Andrew Albright, on the brief).

PER CURIAM

On leave to appeal, the State challenges a June 19, 2019 order granting defendant Laquan Harris post-conviction relief (PCR) and a new trial based on ineffective assistance of counsel. See R. 2:2-3(b).

Having reviewed the trial record, we conclude defendant's trial counsel mounted a vigorous defense over the course of the ten-day trial. The asserted omissions neither made the representation less than adequate nor prejudiced the outcome. Thus, we reverse.

The familiar Strickland v. Washington standard requires a defendant asserting ineffective assistance of counsel in a PCR petition to establish two elements: that the representation he or she received was less than competent and that the deficiency prejudiced his or her right to a fair trial. 466 U.S. 668, 687 (1984); State v. Pierre, 223 N.J. 560, 578-79 (2015). Defendant bears the burden of demonstrating a reasonable probability that the alleged deficiency affected the outcome. Pierre, 223 N.J. at 583. Failure to conduct an adequate pretrial investigation can constitute ineffective assistance of counsel, as such claims may be raised regarding every stage of a criminal prosecution. State v. Allah,

170 N.J. 269, 289-90 (2002); State v. Russo, 333 N.J. Super. 119, 139 (App. Div. 2000).

The trial judge sentenced defendant to thirty-six years imprisonment on March 22, 2013 for first-degree murder, N.J.S.A. 2C:11-3(a)(1)(2), pursuant to the No Early Release Act's eighty-five percent parole ineligibility. N.J.S.A. 2C:43-7.2. We affirmed the jury's verdict. State v. Harris, No. A-4794-12 (App. Div. Mar. 10, 2016).

Our reversal of the judge's order requires context. We therefore provide a detailed discussion of the circumstances.

Defendant was close to Leslie Johnson, whom he saw as a father figure. As a result, defendant became hostile towards the victim Antonio Davis, who at times engaged in armed confrontations with Johnson.

The evening of the murder, at around 5:30 or 6:00 p.m., India Bowers and Alicia McCrary walked by the area of the housing complex in which Davis lived. Bowers gave a statement and testified that she overheard defendant and Davis arguing in the vestibule of one of the buildings of the apartment complex. Davis told defendant he was not allowed in the building, and in response, defendant told Davis that he was "going to put some hot shit in you[,]" which Bowers interpreted to mean defendant was threatening to shoot him.

3

Kristina Jones, a friend of defendant, testified that he stopped by her apartment in an adjoining building in the complex between 6:30 or 7:00 p.m. that day. He wore blue pants and a black zip-up jacket that had large white lettering on it. She said she had previously spoken to defendant about his anger towards Davis, stemming from Davis's conflicts with Johnson. She discussed it with him that day as well.

Marquan Anderson, Davis's cousin, made three statements to the police, which he later repudiated at trial. He initially told police that he saw the shooter approaching the vestibule where he and Davis were selling drugs that night. He actually made eye contact with the person, whom he identified as defendant, for a few seconds. Anderson saw defendant pull a ski mask up to cover the lower portion of his face, so only his eyes were visible. Defendant pushed open the vestibule door, raised his arm, and shot Davis on the left side of his face at close range.

Anderson identified defendant as the shooter only once—during that first interview. On the stand, he claimed he implicated defendant because he wanted the authorities to leave him alone. Anderson insisted he would never be a snitch, because that was something from which you would never recover.

A-5282-18T2

The jury heard the relevant portions of Anderson's first statement in which he implicated defendant. He had known Davis, Johnson, and defendant for years. At the time of the incident, Anderson was acting as a lookout for Davis, who was selling drugs from the vestibule, watching through the glass window of the building's front door.

Once Anderson realized that Davis had been shot, he went immediately to his aid. He asked Davis if he knew the identity of the person who shot him because Anderson believed at that point that Davis would "make it." Anderson testified the victim said that he did not see who shot him. Davis asked Anderson to take him outside; Anderson said it was fifteen minutes before the authorities and medical assistance arrived.

The responding police officer stated Davis was unable to speak, only moan and scream from pain. He rode with the victim in the back of the ambulance to the hospital, and during the ride, Davis had difficulty breathing and did not talk.

A nurse's emergency room notes indicated Davis told an EMT that he did not know who shot him. At the PCR evidentiary hearing, counsel said he knew the identity of the EMT who allegedly made the statement. Counsel's failure to

5

follow up on the note and to call the EMT as a witness, while knowing his identity, was a reason the judge granted defendant a new trial.

Bowers testified that she was home when she received a call that Davis had been shot.[1] She went outside, and saw defendant running away from Davis's building. Defendant was wearing a black do-rag, hoodie, and blue jeans. Bowers was acquainted with defendant, whom she identified from a photo array.

Nearby at approximately 7:00 or 8:00 p.m. that night, Marilyn Howard parked her car.[2] As she was unloading take-out, she heard a peculiar firecracker sound. Howard saw someone running towards her, trying to "tuck" a handgun at his waist while pulling a ski mask back over his face with his other hand. She described him as five foot eleven, thin, and wearing a red baseball cap with reflector, black ski mask, dark jeans, and a hoodie. When she turned towards the building, she saw Davis on the ground.

McCrary was not called either by the State or defendant. She was interviewed by police on April 22, 2009, and reported that her boyfriend, Waheed Washington, was with the victim an hour or forty-five minutes "before

---

[1] In an earlier statement, Bowers said she encountered defendant fleeing from the scene as she returned from a trip to the store.

[2] The time frame was included in the question posed to Howard on direct and never clarified.

he got shot." She also said Washington told her the victim had been shot and nothing more—"if he was out there he didn't tell me and he wasn't gonna go tell me."

In that same statement, which was not played to the jury, McCrary said her cousin phoned, saying she had "heard" that defendant shot the victim. McCrary knew the victim and Johnson had an ongoing conflict, and thought Johnson "had custody of a boy" which might have been defendant. She did not mention being with Bowers that day. At the end of the interview, McCrary asked the detective for his card and volunteered that if she learned any pertinent information, she would contact him.

On February 17, 2012, Bowers went to police and reported that McCrary had confronted her about naming her as a potential witness. Bowers said McCrary told her if she was interviewed about the incident, McCrary was going to say she did not remember anything from the day of Davis's murder, as Washington himself did later when called on the stand.

A cellmate of defendant, who implicated him, also testified. He said defendant told him he was at a "lady friend's" apartment when he came down and bumped into the victim. The two men argued and he shot the victim in the face with a gun. After he killed the man, he took off running.

The cellmate said defendant also told him he was seen by an older lady who was parking her car, but who described his clothing incorrectly. The older lady described defendant as wearing a blue jacket with a black hat, but he was actually wearing a black jacket and blue pants.

During his closing argument to the jury, counsel attempted to highlight that the State did not call McCrary, suggesting the failure to do so was because her testimony might not have been favorable. The trial judge sustained the State's objection to the argument. In the PCR judge's written decision, she relied in part on counsel's failure to further investigate McCrary's statement in preparation for requesting a Clawans[3] charge.

Counsel, admitted to the bar in 1971, testified at the PCR hearing that he focused his practice on criminal law. Once he left full-time employment with the public defender's office, he accepted assignments as designated counsel in conflict cases. He was assigned this case because the matter ended in a mistrial because defendant's public defender had previously represented one of the State's witnesses, a fact discovered only after the trial began. Counsel had tried

---

[3] State v. Clawans, 38 N.J. 162, 171 (1962) ("For an inference to be drawn from the nonproduction of a witness it must appear that the person was within the power of the party to produce and that his testimony would have been superior to that already utilized in respect to the fact to be proved.").

over 300 criminal cases over his career, about 250 of them before he left the public defender's office. He included more than a handful of homicides in this figure.

At the evidentiary hearing, counsel agreed that he should have cross-examined Bowers about her two criminal convictions, since the State had not elicited the information on direct, describing the omission as a mistake. He said, however, his decision not to call McCrary was a matter of strategy. There was a time discrepancy between Bowers's and Howard's testimony, and he wanted the jury to believe that although Bowers may have seen defendant running from the scene, only Howard saw the shooter, at a different time. The jury in fact asked a question about this discrepancy during deliberations.

Counsel described Bowers and McCrary as "loose cannons," and said he decided as a matter of strategy that he had a better chance of convincing the jury that the State had failed to present all the relevant evidence than of getting any useful information from McCrary. Furthermore, he could not have successfully requested a Clawans charge because McCrary was equally available to both parties.

Since the defense theory was third party liability, counsel hoped to capitalize on the time discrepancy between Bowers's and Howard's testimony to

his advantage. He argued in closing that the red cap Howard described the assailant as wearing was not seen by anyone else, and Howard was the only witness not previously connected or acquainted with anyone in the victim or defendant's social circle. He wanted Bowers's identification of defendant to stand because it conflicted with Howard's description.

Counsel explained he did not pursue the dying declaration, either because he "dropped the ball," or because it was a dead end. He said it was difficult after so many years to reconstruct his thinking on the issues being raised at the PCR evidentiary hearing unless there were notes in the file on the subject.

The judge granted defendant PCR relief because she considered Bowers "one of the State's most important witness[es] at defendant's trial[,]" in addition to the reasons we have noted. She found McCrary was "cooperative in her statement" yet said nothing about being with Bowers that day. For that reason, McCrary could have challenged Bowers's identification of defendant. She found counsel's performance "deficient, in part, for failing to conduct an adequate investigation of McCrary." In connection with this mistake, she considered counsel's failure to impeach Bowers with her prior criminal history "create[d] cause for questioning the confidence in the outcome of this case."

Finally, she found counsel's failure to investigate Davis's dying declaration that he did not know who shot him, as repeated in the emergency room notes, to have been a "huge mistake." She further opined that counsel's failure to investigate the source of the statement could not be "upheld" because it was not competent, and defendant was deprived of effective assistance as a result.

On appeal, the State raises the following issues:

> POINT I
> LEAVE TO APPEAL SHOULD BE GRANTED BECAUSE THE STATE WILL SUFFER IRREPARABLE INJURY FROM THE PCR COURT'S ORDER GRANTING DEFENDANT'S PETITION FOR POST-CONVICTION RELIEF.
>
> A. The PCR Court Erred In Finding Counsel Ineffective For Failing To Investigate Or Call Alicia McCrary As A Witness And Was Therefore Ill Prepared To Request A [Clawans] Charge.
>
> B. The PCR Court Erred In Finding Counsel Was Ineffective For Failing To Impeach India Bowers With Her Prior Convictions.
>
> C. The PCR Court Erred In Finding Trial Counsel Was Ineffective For Failing To Investigate The Source Of The Victim's Purported Dying Declaration.

11

We first address the two failures the Law Division judge considered most consequential: counsel's failure to impeach Bowers with her prior criminal history and to interview McCrary so that defendant was in a position to request a Clawans charge. The trial record does not support the conclusion that the failure to interview McCrary was inadequate representation. Additionally, Bowers was not one of the most important witnesses at trial, thus the failure to impeach her did not prejudice defendant's right to a fair trial.

Anderson's description of the incident and his identification of defendant in his first statement were key, as was the cellmate's testimony. The context of the long-standing animosity between defendant and Davis was established not just through Bowers, but through a friend of defendant, and Anderson himself. Thus, Bowers's testimony regarding motive, that she overheard a fight earlier that day during which defendant allegedly threatened Davis, was not the only testimony the State proffered. Bowers's testimony provided an immediacy to the conflict but so did the testimony from Jones, defendant's friend. She also said that she had spoken to defendant over time about the conflict, and that on that day he again expressed his anger towards the victim. This means that although Bowers's description of the fight was significant, the State still had

12

sufficient evidence to establish motive, even if her description had been entirely absent from the record.

Certainly, counsel's testimony that it was a mistake to have failed to impeach Bowers with her prior convictions sounds damning. This "admission" followed his explanation, however, that in order to establish third-party liability, he hoped to highlight the significant difference in timelines between Bowers's and Howard's testimony and was interested in presenting Bowers as a credible witness. The jury during deliberations asked about this very point.

Counsel's representation was not perfect, none are.[4] He had a strategy—a theory of defense which wove Bowers's unimpeached testimony into the presentation he made to the jury in summation. His argument was that the time discrepancy and difference in clothing meant Bowers saw defendant about an hour, if not two, before Howard saw a different man, the shooter. Ultimately, this strategy was unsuccessful. The representation, however, was thorough, included extensive prepared cross-examination of each witness spread out over ten days, and cogent arguments were made at every turn.

_____

[4] For example, Bowers initially had said that she walked past the housing complex a second time to go to the store, as opposed to her statement at trial that she went outside her house after the shooting because she received a call about it. Counsel did not explore that issue. In light of the State's other proofs, it is not clear how the omission affected the outcome.

In order for a party to establish a basis for a Clawans charge, he or she must, among other things, show that the witness was "peculiarly within the control or power of only the one party, or that there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give" and that "such testimony appears to be superior to that already utilized in respect to the fact to be proven." State v. Hickman, 204 N.J. Super. 409, 414 (App. Div. 1985). In this case, those two crucial elements were missing.

McCrary was equally available to both parties. There was nothing so consequential about the testimony she might have given as to whether or not she heard defendant and the victim arguing earlier in the day because the acrimonious relationship between Davis and defendant was not in dispute. Thus, even if counsel had engaged in additional investigation, no basis in the law would have been established to warrant the Clawans charge. Counsel cannot be faulted for failing to conduct an investigation in order to better prepare for a doomed request to charge. Although it is true that counsel's approach failed, in that he unsuccessfully attempted to argue McCrary's absence to the jury to cast doubt on the State's case, it was a strategic gamble.

## II.

Regardless of whether counsel failed to explore the dying declaration, the jury heard Anderson's testimony that the shooter was masked when the incident occurred. Thus, it would not be surprising that the victim who had seconds, if that, to see someone partially obscured by a door could not identify his assailant.

But Anderson said when he asked Davis if he saw who shot him, Davis said no. The jury heard that testimony. Once having heard that from Anderson, counsel may have decided to do nothing further, as it was not necessary and may have only corroborated Anderson's first statement. Counsel said he assumed he had a reason for not calling the EMT, but did not recall what it was. We repeat the obvious—a person whose face is hidden behind a mask cannot be identified, particularly when wearing a head covering as the shooter did in this case. It was ultimately inconsequential that Davis did not know who shot him. The decision not to call the EMT had no impact on the fairness of the trial.

Counsel's representation was competent. Even if we were to conclude it was not, based on the Law Division judge's findings, the specific decisions could not have prejudiced the outcome in light of the other proofs the State presented.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15