**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0968-14T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JULLIAN OREE,

    Defendant-Appellant.

_____

Submitted November 30, 2016 — Decided June 26, 2018

Before Judges Fuentes, Simonelli and Gooden
Brown.

On appeal from Superior Court of New Jersey,
Law Division, Somerset County, Indictment No.
11-06-0410.

Joseph E. Krakora, Public Defender, attorney
for appellant (Peter B. Meadow, Designated
Counsel, on the brief).

Michael H. Robertson, Acting Somerset County
Prosecutor, attorney for respondent (James L.
McConnell, Deputy Attorney General/Acting
Assistant Prosecutor, of counsel and on the
brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

A Somerset County Grand Jury returned Indictment No. 11-06—0410 against defendant Jullian Oree[1], charging him with third degree burglary, N.J.S.A. 2C:18-2(a) (count one); second degree theft of movable property[2], N.J.S.A. 2C:20-3(a), valued in excess of $75,000, N.J.S.A. 2C:20-2(b)(1)(a) (count two); third degree criminal mischief, N.J.S.A. 2C:17-3(a) (count three); and fourth degree resisting arrest by flight, N.J.S.A. 2C:29-2(a) (count four). Defendant was tried before a jury over the course of ten days and convicted of third degree burglary, N.J.S.A. 2C:18-2(a), second degree theft of movable property, N.J.S.A. 2C:20-3(a), and third degree criminal mischief, N.J.S.A. 2C:17-3(a). On January 6, 2014, the trial judge sentenced defendant to an aggregate term of seven years imprisonment, and ordered him to pay restitution in the amount of $117,242.02.

In this appeal, defendant claims the trial judge erred in denying his motion for a judgment of acquittal. We reject defendant's arguments attacking the legal viability of his conviction. Defendant also argues that the trial court erred in

---

[1] The Indictment also named Anthony Bostick as a codefendant. However, on the day this case came to trial, Bostick pled guilty to all of the charges.

[2] N.J.S.A. 2C:20-1(e) defines "movable property" as "property the location of which can be changed, including things growing on, affixed to, or found in land, and documents, although the rights represented thereby have no physical location."

imposing the sentence. We agree and remand this matter for resentencing. Our analysis of the issues raised by defendant is informed by the following facts, which we derived from the evidence presented at trial.

I

This case arises from a burglary that occurred on the night of November 23, 2010, at a residence located in the Borough of Watchung. Earlier that day, defendant texted his former paramour, Nia Weaver, and asked her to rent a car for him. After several unsuccessful attempts, Weaver told defendant that rental cars were in short supply due to the Thanksgiving holiday. Using the alias "Eddie Howell," defendant and another individual rented a Dodge Charger that afternoon from a car rental agency located in Englewood. Only the name "Howell" appeared on the rental agreement.

Sometime between ten and eleven o'clock that evening, Victor Santos returned to his home on Shady Brook Court in Watchung. After opening his garage door, Santos noticed that the basement lights were on and the tools stored in the garage were scattered on the floor; he also heard noises coming from inside the house. Santos used his cellphone to call his neighbor, a retired Watchung police officer. As soon as he arrived, the neighbor noticed "a lot of damage" when he looked into the basement through the window

A-0968-14T1

in the garage.  He called the Watchung Police Department to report a suspected burglary.

Watchung Police Sergeant Gene McAllister was the first to arrive on the scene.  After searching the house to ensure there was no one else inside, McAllister, the neighbor, and Santos walked through the house to assess the damage and determine whether anything had been taken.  Officer Kyle Poulsen also responded to the report of a burglary at the Santos residence.  As he pulled his car onto Shady Brook Court, Poulsen saw a black Dodge Charger backed into the driveway of a nearby home on the block.  Because the area was not well lit, Poulsen used the spotlight mounted on his police car to illuminate the driveway where the Charger had stopped.  Poulsen noticed the car's engine was still running and two individuals were seated in the front seats of the vehicle.

Poulsen parked his police car and began to walk toward the driveway where the Charger had stopped.  As he approached, he noted the occupants were two African American men; the man seated on the driver side was wearing a white sweatshirt and the passenger wore a similar, blue-colored garment.  When he was approximately ten to twelve feet away from the driver of the Charger, Poulsen yelled, "Officer Poulsen, Watchung Police Department. Roll the window down."  According to Poulsen: "At that point, the vehicle immediately sped off."

Poulsen radioed the Charger's license plate number and returned to his patrol car to pursue it. Police Officer Jason Moberly, who was also responding to the burglary report, heard Poulsen's radio dispatch. Moberly saw the Charger turn right onto Valley Road, without making any effort to comply with the stop sign that was posted at that location. Moberly immediately activated his patrol car's overhead lights and began pursuing the Charger. He was soon joined by Poulsen, who likewise had activated his emergency lights and sirens.

The Charger continued eastbound on Valley Road and ran through a red light. Moberly shined his light on the Charger's rear window while in pursuit and noticed that there were actually four occupants in the car, all African American men. Moberly also testified that while pursing the Charger, he "observed sparks on the right hand side of the vehicle . . . ." The pursuit continued past the residence of Debra Krienke, who observed the Charger and heard "something clang at the end of [her] driveway." The following day, she found a "yellow crowbar" at the end of her driveway.

The pursuit ended in the parking lot of a Watchung museum. The Charger entered the parking lot, hit a dip, spun out, and eventually ended up facing the opposite direction. As Moberly entered the parking lot, the Charger was facing the patrol car;

the Charger accelerated and collided with the patrol car head-on. Immediately thereafter, all four of the Charger's doors opened and its four occupants fled. The two men seated on the right side of the vehicle fled southeast; the two men seated on the drivers' side ran southwest.

Moberly ran after the two who had fled from the passenger's side, shouting for them to stop. While in pursuit, Moberly noticed that the individual directly in front of him was approximately six feet tall, was wearing a dark sweatshirt and dark blue pants, and threw something up into the air. The area was dark and heavily-wooded. At one point, Moberly tripped over a tree root and fell to the ground. He lost track of the suspect by the time he got back on his feet.

Watchung Police Sergeant Andrew Hart was off duty when he heard of the pursuit and proceeded to the museum parking lot. Moberly told Hart that the fleeing individual, later identified as defendant, had discarded an object in the course of the foot pursuit. A ski cap was discovered in the area and turned over to Detective Kenneth Boyle. A canine (k-9) team, consisting of a police officer and his canine partner, responded to the scene and located codefendant Bostick, who was taken into custody.

After going through the house, Santos and Sergeant McAllister found damage in an area of the basement where a safe was located

A-0968-14T1

with its wheels anchored to the floor. The sheetrock walls of the closet in which the safe was kept had been torn down and there were pieces of sheetrock and sheetrock dust on the floor. An inspection of the safe revealed pry marks and paint marks on the back. There were several footprints on the pieces of broken sheetrock and on the safe; several other pieces of sheetrock had tool marks with a distinct "waffle pattern."

In the master bedroom upstairs, various dresser drawers and other items had been scattered across the room. Pillow cases from the bed and several expensive watches were also missing. The police found one of the pillow cases in the basement on the floor. In it, the officers found fifteen watches, cuff links, and tie-clips, worth approximately $68,000 in total. Officers also recovered as evidence two hammers with waffle-type patterns on the heads, a machete with a bent tip, two screwdrivers, pieces of broken sheetrock and carpet, both with footprints, and the pillow case found in the basement.

On the exterior of the home, the police discovered that the wires for the telephone, cable, and alarm system had been cut; the back door appeared as if it had been "shouldered" opened by force. In the utility closet, a burglar alarm panel had been ripped off the wall.

A-0968-14T1

Approximately ninety minutes after the pursuit that ended in the museum parking lot, State Trooper Marcan Kolodziej responded to a report of a man found walking in the area of mile-marker forty-seven along Route 78. This individual was later identified as defendant. Despite the cold weather, defendant was only wearing dark pants and a white t-shirt. Defendant was detained and transported to the Watchung police station.

Moberly recognized defendant as one of the men who fled from the Charger. During the foot chase, Moberly particularly noticed the "discoloration" on his neck, which matched the tattoo on defendant's neck. The thorny burrs defendant had on his pants also matched those Moberly had on his clothing following the foot chase through the woods. Detective Anderle also noticed that the pattern on the soles of defendant's shoes matched those left in the sheetrock dust at the crime scene; defendant's shoes had the same sheetrock dust on the soles.[3]

Before asking defendant any questions concerning these crimes, the police officers read to defendant his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Defendant thereafter

---

[3] While at the police station, defendant asked Moberly for a drink of water. Moberly gave defendant a Styrofoam cup from which he drank the water. After defendant threw the cup in the garbage, another officer recovered it for a potential DNA analysis.

verbally and in writing agreed to waive his rights and answer the police officers' questions. The police officers video recorded both the waiver and the interrogation. Defendant stated that earlier on November 23, 2010, he had gone to Allentown[4] with his girlfriend Nia Weaver. On their way back, they started "beefin" (which we infer to mean argue), causing Weaver to pull over and demand that defendant get out of her car. Defendant claimed he was left stranded on the side of the road. He tried to call his mother on his cellphone and tried to find a gas station. Several minutes later, State Trooper Kolodziej picked him up. Defendant denied any involvement with the burglary of Santos's home.

While patrolling the area where the pursuit occurred on Coles Avenue, Officer Poulsen found a blue and yellow pry bar. When the police officers returned to Santos's home during the daylight to survey the damage, they noticed several outdoor landscaping lights had been smashed and no longer pointed in the direction of the home. The police also impounded and photographed the Charger. After securing a warrant, Sergeant Kelly and Detective Anderle searched the interior of the car and found a plastic Coke bottle, a New York Yankees baseball cap, an empty chip bag, small pieces

---

[4] The record is not clear whether defendant was referring to Allentown, Pennsylvania or Allentown, New Jersey.

of sheetrock, a fingernail clipping, four pry bars, and the car rental paperwork.

On December 2, 2010, the Styrofoam cup defendant used to drink water at the police station and the evidence recovered from the Charger were sent to the State Police Laboratory for forensic analysis. Samples were taken from the black knit cap, the Yankees hat, the Coke bottle, the Styrofoam cup, and the fingernail clipping. The Laboratory's DNA Unit Forensic Scientist, Mary E. Kite, conducted a DNA analysis of these items. Kite testified that there was a mixture of DNA on the Styrofoam cup and there was one source of DNA on the fingernail.

On August 26, 2011, the police obtained two buccal swabs from defendant in order to compare the results to a profile. Kite conducted an analysis and testified that defendant was the major contributor to both the cup and the fingernail. There were three contributors to the black knit cap and at least two contributors were found on the Coke bottle. Defendant did not contribute any DNA material to these items. Finally, no DNA was recovered from the sample taken from the Yankees hat.

The police sent the various burglar tools recovered, including the pry and crowbars, hammers, and screwdrivers to the FBI Laboratory in Quantico, Virginia. An analysis of the paint residue on both revealed that there was "no difference" between

10                                                        A-0968-14T1

the samples on the two pry bars recovered. The FBI also determined that the paint transfer marks discovered on the safe and on the carpet could have come from the same two pry bars. A forensic footwear and tire examiner from the FBI Laboratory conducted a comparison of the sole marks found on the dry wall debris and defendant's shoes. He concluded that defendant's shoes could have made the impressions found on five pieces of sheetrock and one board.

Santos attested at trial as to the value of the items, which were in excess of $75,000. Defendant did not testify and did not present any witnesses. After the State rested, the trial judge denied defendant's motion for a judgment of acquittal under Rule 3:18-1. The judge also denied defendant's motion for a new trial under Rule 3:18-2. The judge held a restitution hearing and found the victim was entitled to $117,242.02.

II

Against this factual backdrop, defendant raises the following arguments:

> POINT ONE
>
> THE TRIAL COURT ERRED IN (A) DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL AT THE END OF THE STATE'S CASE AND (B) DENYING DEFENDANT'S MOTION FOR A NEW TRIAL.
>
> POINT TWO

A-0968-14T1

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S REQUEST FOR A "MERE PRESENCE" JURY INSTRUCTION.

POINT THREE

DEFENDANT'S SENTENCE WAS EXCESSIVE AND UNDULY PUNITIVE, AND THE COURT IMPROPERLY APPLIED AGGRAVATING AND MITIGATING FACTORS.

This court utilizes the same standard used by the trial judge in reviewing a motion for judgment of acquittal. State v. Bunch, 180 N.J. 534, 548-49 (2004). We must determine

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [State v. Reyes, 50 N.J. 454, 459 (1967).]

Under Rule 3:18-1, the court "is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State." State v. Muniz, 150 N.J. Super. 436, 440 (App. Div. 1977). "If the evidence satisfies that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004).

Here, the record shows the State satisfied this burden of proof. The record we have described at length here speaks for itself in this respect. We reach the same conclusion with respect

12

to defendant's motion for a new trial under Rule 3:18-2. "[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000). An abuse of discretion only arises on demonstration of "manifest error and injustice[,]" State v. Torres, 183 N.J. 554, 572 (2005), and occurs when the trial judge's "decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)).

Here, the record again shows that the evidence presented by the State supports the jury's verdict. There is thus no indication that the trial judge abused his discretion in denying defendant's motion for a new trial. This same approach leads us to reject defendant's claim of error in the judge's decision not to charge the jury with the "mere presence" model charge. Defense counsel requested a "mere presence" charge as follows:

> Mere presence at or near the scene does not make one a participant in the crime nor does the failure of a spectator to interfere make him or her a participant in the crime. It is, however, a circumstance to be considered with the other evidence in determining whether he or she was present as an accomplice. Presence

is not in itself conclusive evidence of that. Whether presence has any probative value depends upon the total circumstances.

After some discussion with counsel, the judge ultimately declined to include the charge. The judge provided the following explanation for his ruling:

> I don't think he is entitled to a mere presence charge. This is not a case which the mere presence charge should be contemplated. The mere presence is where you have either a perpetrator or a bystander to the event. [Defendant] is either a perpetrator or he's nothing. He's certainly not a bystander. He's certainly not someone present at the scene whose presence involves or implicates acquiescence, failure to intervene, or any of the other bystander-type indicia.

We discern no legal basis to disagree with the judge's ultimate conclusion. The mere presence charge is inapplicable here.

We will now address the sentence imposed by the court. Defendant was thirty-two years old at the time he appeared before the court for sentencing. This was his first and only involvement with the criminal justice system. He has no criminal record as an adult or any history of delinquency as a juvenile. He graduated high school, attended two years of college, and had been employed by the Xerox Corporation as a technician for the past thirteen years. Defendant owns his own home. He has two daughters who, at the time of sentencing, were five-years-old and five-months-

14

old. The older child resided with her mother in North Carolina; the younger child resided with her mother in New York City. Defendant financially supports both of his daughters.

After reviewing this record, the trial judge found the following aggravating factors: the risk that defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3), and the need to deter defendant and others like him from violating the law, N.J.S.A. 2C:44-1(a)(9). <u>The judge did not find any mitigating factors</u>. The judge provided the following explanation for this decision:

> Although defendant has no prior criminal record, this court finds based upon the activity obviously engaged in, in preparation for this crime, the precision and professionalism with which it was conducted, the selection of this particular house, as might be characterized as a high-valued target, there being allegedly some $143,000 in property taken -- allegedly taken, as I recollect.
>
> It is the determination of this court that aggravating factor three applies.
>
> Certainly, aggravating factor nine applies, the need for deterring defendant and others from violating the law.
>
> <u>No mitigating factors are substantially supported by the circumstances here and, thus, none are found to apply</u>.
>
> [(Emphasis added).]

In determining what sentence to impose, the judge "must identify any relevant aggravating and mitigating factors set forth

15

in N.J.S.A. 2C:44-1(a) and (b) that apply to the case" and "[t]he finding of any factor must be supported by competent, credible evidence in the record." State v. Case, 220 N.J. 49, 64 (2014) (citations omitted). As Justice Albin emphasized in Case: "Speculation and suspicion must not infect the sentencing process; simply put, the finding of aggravating or mitigating factors must be based on evidence." Ibid. Thus,

> [t]he "structured discretion" established by the Code of Criminal Justice compels the sentencing court to explain on the record its analysis of the statutory aggravating and mitigating factors "with care and precision" so as "[t]o avoid disparity in sentencing as the Legislature intended, to facilitate fair and effective appellate review, and to ensure that the defendant, the State and the public understand the reasons for the sentence."
>
> [State v. McFarlane, 224 N.J. 458, 466 (2016) (quoting State v. Fuentes, 217 N.J. 57, 81 (2014)).]

Here, the judge did not give any consideration to defendant's lack of prior involvement with the criminal justice system, his educational background, his lengthy history of employment with a major technology corporation, his commitment to support his children, or his obligation to pay restitution to the victim of his crime. Under these circumstances, defendant's criminal behavior stands in sharp contrast to the law abiding, socially responsible life he had lived up to this point. The judge's

16

finding of aggravating factor N.J.S.A. 2C:44-1(a)(3) is not supported by the record and his conclusory statement in support of this aggravating factor does not comply with the requirements of Rule 3:21-4(g).

Finally, we discern no legal or factual basis for the judge's failure to find any mitigating factors. Under these circumstances, there is ample evidential support for the court to have found the following mitigating factors: defendant has compensated or will compensate the victim of his conduct for the damage or injury that he sustained, N.J.S.A. 2C:44-1(b)(6); defendant has no history of prior delinquency or criminal activity, N.J.S.A. 2C:44-1(b)(7); and defendant's character and attitude indicate that he is unlikely to commit another offense, N.J.S.A. 2C:44-1(b)(9). These suggested mitigating factors are not to be considered by the trial court or the parties as a conclusive or exhaustive list of the mitigating factors that may be applicable here.

We affirm defendant's conviction and remand for the trial court to resentence defendant without consideration of aggravating factor N.J.S.A. 2C:44-1(a)(3), and after giving due consideration to the mitigating factors we have identified here, as well as any other mitigating factors the court finds are supported by the record. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0968-14T1