**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5555-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

NICHOLAS A. ABBATI,
a/k/a NICHOOLAS ABBATI,

     Defendant-Appellant.

_____

        Submitted April 5, 2022 – Decided July 5, 2022

        Before Judges Fisher and Currier.

        On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 16-09-2148.

        Joseph E. Krakora, Public Defender, attorney for appellant (Andrew R. Burroughs, Designated Counsel, on the briefs).

        Matthew J. Platkin, Acting Attorney General, attorney for respondent (Regina M. Oberholzer, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant appeals from his convictions and sentence, alleging numerous trial court errors including the denial of his motions for mistrial and for a new trial, errors regarding several evidentiary rulings and the jury instructions, and contending the court violated a trial witness's Fifth Amendment rights. After a careful review of the record and applicable principles of law, we affirm.

I.

Defendant was charged with the murder of Jahlil Hunter and the attempted murder of Ebony Harris, Hunter's girlfriend.[1] He testified at trial that he used heroin and cocaine daily and Hunter was his primary source for the drugs.

On December 23, 2015, police officer Matthew Laielli responded to a reported assault at a residence in Pleasantville. Christopher Harris, Ebony's brother, was at the house and called the police at 9:23 p.m. Laielli saw Hunter and Ebony lying in the living room. He testified he was familiar with the victims because Hunter was a known drug dealer in the area and Ebony was his girlfriend. Laielli said Ebony was "l[ying] on her back with obvious severe facial trauma, blood all over her face, blood all over her body," and the top right

---

[1] Specifically, defendant was charged with first-degree murder, N.J.S.A. 2C:11-3; first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)(2); and third-degree possession of a weapon for unlawful purposes, N.J.S.A. 2C:39-4(d).

portion of her head was peeled open and "hanging off the side of her head." The officer said he could see brain matter and broken skull pieces. Hunter was lying in the fetal position near Ebony. He was covered in blood. Laielli described "thick coagulated blood coming out of [Hunter's] ear," and that his head was swollen. Although the victims appeared to be alive when Laielli arrived, he believed they would die "a very short time after" his arrival.

Hunter remained on life support for eleven days after the attack until the equipment was removed and he died. Ebony was diagnosed with a traumatic brain injury. She has had several strokes and suffers from seizures. Ebony is blind in one eye and has poor vision in the other. She also has a history of depression. Ebony is confined to a wheelchair and lives in a nursing home.

Christopher Harris lived with Ebony, Hunter, and several others at the Pleasantville residence. He testified that Hunter sold drugs in the area but only let one or two people into the house. This included defendant, also known as "Ink," and Patrick O'Brien. Christopher said he was "very good friends" with defendant and defendant was close with both Hunter and Ebony. Christopher said defendant drove a pickup truck and worked doing "construction and tattoos." Christopher told the jury he had seen defendant doing drugs in the house and using a vinegar bottle to cook or mix them.

A-5555-18

On December 23, 2015, Christopher left the house around 3:00 p.m. Hunter, Ebony, and two other people were still in the house. When Christopher returned later that evening around 8:00 or 9:00 p.m., he noticed that the front door was unlocked. After entering the home, Christopher saw his sister and Hunter on the floor and blood everywhere. He said his sister's head was cracked open and her brain was visible. He observed that Hunter had a gash on his head and his pants pockets were turned inside out. Christopher also noted the Xbox was missing.

Patrick O'Brien testified during the trial that Hunter was his drug dealer and sold him drugs from his house in Pleasantville. O'Brien stated he was friends with defendant, also known as "Ink," and they often got high together. He also testified that defendant owed Hunter money at the time Hunter was killed.

O'Brien stated that he and defendant often visited Hunter's house. They would call ahead to get permission to come to the house, and then call again after they arrived. O'Brien said the door was always locked and after they knocked on it, somebody would unlock the door to let them in. Sometimes Hunter would permit O'Brien and defendant to use drugs at his house, but other times, Hunter would ask them to take the drugs and leave. O'Brien also stated

4

that defendant always brought a big bottle of vinegar to Hunter's house to dissolve crack cocaine. When O'Brien saw defendant after the murder, O'Brien noticed defendant had red scratches on his neck.

The State also presented Ellis Goodson as a witness. Goodson shared a prison cell with defendant in January 2016. He reached out to the prosecutor's office and gave police a recorded statement in March 2016.

During defendant's trial in March 2019, the prosecutor asked Goodson if he and defendant ever shared stories or talked to each other when they shared a cell. Goodson responded that he wanted to "plead the fifth." After some discussion, the judge instructed Goodson that he should "not testify [to] anything that would possibly incriminate [him] . . . [h]owever, [he could] testify . . . to any stories or any other information that [he was] asked about that d[id] not involve [him]." The court further explained to Goodson that his Fifth Amendment right only applied to him personally and described it as "self-incrimination." The judge stated that "asking [Goodson] about someone else's statement" was not infringing Goodson's constitutional right. The judge directed Goodson to answer counsels' questions but cautioned him not to testify to anything that might implicate him in a crime.

A-5555-18

Goodson then asked for a lawyer. The trial court denied his request, finding that Goodson was not in custody and was not being interrogated for "the purposes of getting a statement." Therefore, he was not entitled to the appointment of an attorney.

Thereafter, Goodson told the jury that defendant had spoken to him about the attack on Hunter and Ebony. Goodson testified that defendant murdered Hunter because Hunter threatened defendant's family, specifically his sister, because defendant owed Hunter money for drugs.

After Goodson said he could not remember everything discussed with defendant three years earlier, he was shown his prior recorded statement given to police. According to Goodson, defendant received a phone call from Hunter asking about the money defendant owed him. Defendant then drove his pickup truck to Hunter's house. He took a crowbar[2] "or something to pull nails," and placed it inside his shirt sleeve. After defendant called to say he was at the house and knocked on the door, Hunter opened the door, and defendant assaulted him. When Ebony came running to the door, defendant struck her too. Goodson said defendant told him he used vinegar to clean up and "roughed the place up,

---

[2] Goodson said defendant told him he had a crowbar and the other tool because he was a carpenter.

A-5555-18

. . . took some drugs, . . . and left." After leaving, defendant discarded the crowbar. Then defendant checked himself into a rehabilitation facility and discarded or traded his clothing during his stay.

Goodson recalled defendant telling him he used vinegar to take off the baking soda from crack cocaine. Goodson testified that defendant knew Hunter was dead after the assault, but he was unsure about Ebony. According to Goodson, the murder was premeditated because defendant told him that "somebody made a threat against his family."

During cross-examination, defense counsel asked Goodson about his time in the holding cell in the courthouse while waiting to give testimony. Goodson said he and four other witnesses were in the same holding cell for approximately one hour prior to Goodson's testimony. Goodson testified that he heard the other witnesses talking about the case and defendant, but he did not discuss the case and just listened. Goodson also testified that he did not know the other four witnesses and had never met any of them prior to being placed in the holding cell.

Rashaud Washington also testified. Although he recalled being cellmates with defendant for five months, he denied any recollection of defendant imparting any information to him about the murder. He stated he might have

been under the influence of "psych meds" when he gave the statement despite being incarcerated at the time. Even after being shown a transcript of his January 2018 recorded statement, Washington could not remember any information. Initially, he could not corroborate it was his voice on the recording.

In the audio recording played for the jury, Washington explained defendant told him he was stressed out because he did not have any drugs. Defendant said he was in a secret relationship with Ebony, and when he went to Hunter's residence for drugs, Hunter refused to give him any. This offended defendant, and he attacked Hunter with a hammer and "didn't care at all" because Hunter "got what he deserved." He denied hurting Ebony.

On cross-examination, Washington conceded he reached out to the prosecutor's office to give the statement in 2018 because Ebony was his girlfriend. He further testified that he did not learn any of the information provided in his statement from defendant, but rather, other people told him about the attack and murder.

Thomas Dougher was defendant's cellmate in January 2018. He testified that defendant told Dougher about the events regarding the attack on Hunter and Ebony. According to Dougher, defendant said he went to Hunter's residence to

trade prescription drugs for heroin. Although defendant said he and Hunter often did business this way, this time Hunter only wanted cash.

Defendant told Dougher he and Hunter argued over the drug transaction, which escalated into a physical altercation. At one point, Hunter was on top of defendant, but defendant was able to free himself, grab a nearby wrench, and hit Hunter on the head with it. Defendant told Dougher that a woman came into the room with a gun and pointed it at defendant. However, when she went to pull the trigger, she did not operate it properly and the gun did not fire. When defendant saw the gun was not firing, he stood up and began to hit the woman on her head with the wrench. Defendant took the wrench and gun and a few bags of heroin with him when he left the house.

Defendant told Dougher that he believed he had killed Hunter and Ebony, but he did not think he would get caught because of the large gap of time between when he was known to be at the house and when the victims' bodies were discovered. Dougher described defendant as calm while recounting the details of the attack.

A fourth former cellmate, Ky Maultsby, testified. He also knew defendant as "Ink." According to Maultsby, defendant said he beat two people with a bottle

or "something else" when a drug deal went wrong.[3] Defendant left the house in his truck and went to talk to his mother about what had happened. When the police came to his mother's house, defendant drove away and parked in the woods. Defendant also told Maultsby that the male victim died, but defendant thought there was not enough evidence to convict him of murder, so he was not worried.

The State also called Emanuel Heath as a witness. Heath testified that he did not remember ever spending time with defendant. He acknowledged giving a statement to police but said "[i]t was a fabricated story, it was a lie." Heath was an extremely uncooperative witness and repeated continuously that he would not answer any questions and that his earlier statement was all lies. Outside the presence of the jury, Heath advised the court that O'Brien and Dougher also fabricated their stories. He stated: "These guys told me that they were going to fabricate their stories because it wasn't true."

When the prosecutor played the audio recording of Heath's December 22, 2016 statement to police, Heath confirmed it was his voice "but it was all lies." The jury returned to the courtroom and Heath reiterated that he gave a statement

---

[3] After Maultsby was shown his recorded statement previously given to police, he recalled that defendant said he beat the victims with a bat.

to the police, but it was "fabricated." In the statement, Heath recounted to police that defendant told him he had attacked two people related to a drug transaction. Defendant said the man died but the female victim survived, although she did not remember anything about the attack. Heath also told police that defendant was concerned about fingerprints on a vinegar bottle left behind at the victims' residence. According to Heath, defendant checked himself into a rehabilitation facility after Christmas.

The following colloquy took place during cross-examination:

> [Defense counsel]: Okay. Were you in the same holding cell with three other individuals who were brought in to testify?
>
> [Heath]: Yes, sir.
>
> [Defense counsel]: Did they tell you—
>
> [The State]: Objection.
>
> [Defense counsel]: —they were going to lie?
>
> [The State]: Objection.
>
> THE COURT: Approach.
>
> [Heath]: Yes, sir.
>
> THE COURT: Please approach.
>
> ….

11

[The State]: How many times are you going to ignore the judge's ruling.

THE COURT: The same—same, same issue as before. You can't testify to non-party statements that are out of court. It's hearsay, unless you got an exception for me.

Following Heath's testimony, the State called Detective Jason Dorn of the Atlantic County Prosecutor's office. Dorn testified that he arrived at Hunter's residence and learned the victims were at the hospital and Christopher Harris was at the police station. During his investigation Dorn learned that defendant used vinegar to ingest heroin and cocaine. He testified that police recovered two vinegar bottles during their search of Hunter's residence.

Dorn also testified regarding text messages extracted from Hunter's cellphone exchanged between defendant and Hunter on December 23, 2015. In the messages, Hunter and defendant agreed to meet that day to exchange drugs. In the last message, sent at 7:36 p.m., defendant said he was going to bring Hunter the prescription drugs.

Dorn further testified that police obtained a warrant and seized defendant's cellphone from his mother's home. The messages between defendant and Hunter found on Hunter's phone were no longer on defendant's cellphone. During the search, the police also took four hammers due to the medical examiner's opinion that Hunter's wounds pattern was consistent with being struck with a hammer.

12

Defendant's mother provided police with the location of the truck. When the truck was recovered, police seized another hammer found in it. Defendant's DNA was not found on any of the hammers.

Dorn was also asked about his interviews with several of the witnesses. As to Goodson, Dorn stated he did not talk to Goodson prior to taking the recorded statement and he did not offer him anything in exchange for the statement. Dorn gave similar answers regarding his interactions with Washington and Heath.

Dorn was also asked about his conversation with Heath the week before trial. Heath told Dorn he was not coming to trial and he did not want to testify. Heath also said that defendant had asked him to give the police "a bad story" as to what happened on December 23, 2015 in order to confuse police and the facts. Heath had not told police this when he gave a recorded statement in December 2016.

The county medical examiner testified regarding the results of Hunter's autopsy. He concluded that the cause of death was "multiple blunt force injuries to the head," and the manner of death was homicide. In addition to the lacerations on Hunter's head, the skull was deformed, and his eye sockets, cheekbone and nose were broken. Noting the "waffle" or "checkerboard" pattern

13

of dots on Hunter's head, the medical examiner testified the injuries were "consistent with being struck with an object . . . which could be found on [a] framing or roofing hammer or another object such as a meat tenderizer."

Ebony was twenty-one years old at the time of the attack. During her trial testimony, she recalled living in a home in Pleasantville with Hunter, her brother Christopher, and two other people. She said she and Hunter sold drugs. She stated that defendant came to Hunter's house "[e]very day," and she had known him for four or five years. She also recalled defendant bringing vinegar to the house. Ebony said defendant owed Hunter money. It was common practice between Hunter and defendant to swap prescription pills for heroin.

Ebony stated she and Hunter kept the doors locked. When defendant came over, he had to call first and when he arrived, they would speak to him through the locked door before letting him in to "make sure [they were] safe."

Harris does not remember anything about the attack itself. She recalled playing Xbox during the day, but nothing else until she woke up from a coma in the hospital.

Defendant's brother, Vincent, also testified during the trial. He stated that defendant spent time with Vincent and his mother over the Christmas holidays.

 A-5555-18

During their time together, Vincent did not notice that defendant had any cuts or other wounds on his body.

Vincent testified that he learned of the attack when police went to his mother's house looking for defendant. At that time, defendant was in a rehabilitation center. Vincent called the facility and spoke to defendant, telling him to call the police. Defendant responded that he "can't do that, it's over for me." Defendant also asked his brother for money to buy drugs. Vincent testified that defendant wanted money because he planned to overdose and kill himself. After the phone call, Vincent called the police and told them where defendant was.

Defendant testified during the trial, telling the jury that, at the time of these events, he was injecting heroin and cocaine daily and Hunter and Ebony were his primary source for the drugs. Defendant visited their residence in Pleasantville often, sometimes more than once a day. He said he purchased drugs at the residence and, if permitted, he would use drugs while at the home. Defendant confirmed he drove a pickup truck, and because he did construction work, he kept multiple types of tools in his truck.

When asked about his actions on December 23, defendant testified that he slept in his truck the night before. When he woke up, he ingested drugs and then

called Hunter. He told Hunter he had Percocet and some other pain pills. Thereafter, defendant went to Hunter's residence and purchased four bags of heroin and gave Hunter the pills. However, defendant had brought the wrong pills so he told Hunter he would return later that day "because the first four bags [of heroin were] just to get [him] up and moving." Defendant conceded he owed Hunter some money, but it was only "a little bit" and he thought he repaid him before the initial transaction.

Defendant returned to Hunter's residence later that day and exchanged pills for several bags of heroin. Defendant stated he was only in the house five minutes, estimating he arrived between 7:30 and 7:40 p.m. and leaving by 7:45 p.m. Shortly thereafter, between 8:30 and 9:00 p.m., he saw Ebony's mother at the bus terminal, and she told him what had happened to Ebony and Hunter. Defendant stated he was "shocked" and "surprised" when he heard about the attack. Defendant was unsure whether he spent the rest of the night in his truck or whether his mother picked him up that night.

Defendant discussed his use of vinegar bottles. He said he used them to dissolve crack cocaine in order to ingest it by needle. He said he always had vinegar bottles with him and that he left one or two at Hunter's house after he was there the second time on December 23.

16

On December 24, defendant went with his mother and sister to his brother's house in Brick for the holidays. He said that for the next week his brother drove him back and forth between his brother's house and a methadone clinic in Somers Point. He also spent some time in Pleasantville.

On January 4, 2016, defendant entered a rehabilitation program. He admitted he called his brother asking for money for drugs and stating he wanted to run away. Later that month, police came to the facility and took him to the local police station for questioning. Eventually he was detained in the Monmouth County jail on unrelated warrants.

Defendant testified that while in jail, his cell mate, Goodson, asked him a lot of questions about the Pleasantville events. Defendant said he discussed the "situation" with Goodson but never confessed to any crime. Defendant also testified that when he was transferred to the Atlantic County jail, he did not confess to committing any crime to his cell mates or any other prisoner.

The jury convicted defendant on all charges. The court sentenced defendant to an aggregate term of sixty years in prison subject to an eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The sentences for murder and attempted murder ran

17

consecutive to each other. The weapons offense conviction merged into the first-degree murder count.

## II.

Defendant presents the following points for our consideration:

> POINT I. THE TRIAL COURT ERRED WHEN IT DENIED THE MOTION FOR A MISTRIAL AFTER THE PROSECUTOR MADE DEROGATORY COMMENTS ABOUT DEFENDANT DURING OPENING REMARKS AND THE TRIAL COURT COMPOUNDED THE PREJUDICE BY FAILING TO SUA SPONTE PROVIDE THE JURY WITH A CURATIVE INSTRUCTION.
>
> POINT II. THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION THAT EMANUEL HEATH BE ALLOWED TO TESTIFY [AS TO] HOW THE STATE'S WITNESSES CONSPIRED TO FRAME DEFENDANT FOR THE CRIME AS THE HEARSAY DECLARATIONS WERE CLEARLY ADMISSIBLE UNDER N.J.R.E. 803(c)(25).
>
> POINT III. THE TRIAL COURT'S INAPPROPRIATE INTERFERENCE WITH ELLIS GOODSON'S RIGHT TO INVOKE HIS FIFTH AMENDMENT PRIVILEGE TO REMAIN SILENT AND HIS RIGHT TO COUNSEL, DENIED DEFENDANT HIS RIGHT TO FAIR TRIAL.
>
> POINT IV. THE TRIAL [COURT] ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON THE LESSER INCLUDED CHARGE OF MANSLAUGHTER, AS TO COUNT 1, AND AGGRAVATED ASSAULT, AS TO COUNT 2.

18                                                                          A-5555-18

POINT V.    THE COURT ERRED WHEN IT PROVIDED A "FALSE-IN-ONE" CHARGE TO THE JURY OVER DEFENDANT'S OBJECTION.

POINT VI.    THE TRIAL COURT'S FAILURE TO ENSURE THAT THE STATE'S JAIL HOUSE WITNESSES WERE PROPERLY SEQUESTERED DENIED DEFENDANT HIS CONSTITUTIONAL RIGHT TO A FAIR AND RELIABLE TRIAL. (NOT RAISED BELOW).

POINT VII.    THE TRIAL COURT ERRED WHEN IT ALLOWED DETECTIVE DORN TO TESTIFY AS A REBUTTAL WITNESS TO E[MANUEL] HEATH AND FAILED TO PROVIDE THE JURY WITH THE REQUISITE LIMITING INSTRUCTION.

POINT VIII.    THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION FOR A NEW TRIAL, OR IN THE ALTERNATIVE, THIS COURT MAY FIND THAT TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO ADEQUATELY INVESTIGATE THE CASE.

POINT IX.    THE TRIAL COURT'S CUMULATIVE ERRORS DENIED DEFENDANT A FAIR TRIAL.

POINT X.    THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.

A.

We begin by addressing defendant's contentions regarding the opening statement.  During the State's opening, the prosecutor remarked: "Ladies and gentlemen, this defendant sits before you now, this coward, this murderer,

Nicholas Abbati, Jr. He beat his one friend to death, and he tried to do the same with the second." The prosecutor also stated that defendant "took" Ebony's eye, and that the "physical evidence is also good, strong evidence, . . . you'll get plenty of it in this trial."

Defense counsel objected and moved for a mistrial after the prosecutor finished his statement, arguing "that opening was designed to completely inflame this jury" in stating defendant was a coward and a murderer. In denying the motion, the court found the opening statement was "appropriate." The judge stated:

> With regard to trying to inflame the jury, it's the [S]tate's theory of the case. I think it's an appropriate theory of the case. I found nothing inflammatory about it, other than the fact that they're describing how they view the case, and how they view this defendant. I don't think there was any mention—any reference to any evidence that would be clearly inadmissible, and frankly I find nothing wrong with the opening arguments.

A decision to grant or deny a motion for mistrial is addressed to the sound discretion of the trial judge and will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Jackson, 211 N.J. 394, 407 (2012)).

"A prosecutor's opening statement should provide an outline or roadmap of the State's case . . . ." State v. Land, 435 N.J. Super. 249, 269 (App. Div. 2014) (internal citations omitted). Moreover, opening statements "should be limited to a general recital of what the State expects, in good faith, to prove by competent evidence." Ibid. (quoting State v. Walden, 370 N.J. Super. 549, 558 (App. Div. 2004)). Prosecutors must abide by "certain fundamental principles of fairness." State v. Echols, 199 N.J. 344, 359 (2009) (quoting State v. Wakefield, 190 N.J. 397, 436 (2007)).

In his opening statement, the prosecutor provided a roadmap of the State's case and what it intended to prove. Defendant was charged with murder and the prosecutor told the jury what evidence he intended to present to show defendant was a "murderer." The comments regarding Ebony's eye and defendant being a "coward" were related to the State's theory of the case—defendant attempted to murder Ebony, leaving her blind in one eye, and that after attacking Hunter and Ebony, defendant ran away like a "coward."

As to the prosecutor's statement relating to physical evidence, he told the jury he intended to establish defendant's presence at the murder scene because of the vinegar bottles found at the victims' residence, as well as presenting evidence that Hunter's death and Ebony's severe injuries were caused by

21

repeated hits over the head with a hammer or wrench—tools accessible to defendant. There were repeated references to physical evidence throughout the trial.

The court did not abuse its discretion in denying defendant's motion for a mistrial. The prosecutor's comments did not "stray over the line of permissible commentary." See State v. Williams, 244 N.J. 592, 608 (2021) (quoting State v. McNeil-Thomas, 238 N.J. 256, 257 (2019)). The State told the jury how it intended to prove defendant had murdered Hunter and nearly beaten Ebony to death. Moreover, the comments were not so egregious to deprive defendant of a fair trial. See Wakefield, 190 N.J. at 446.

We also see no merit in defendant's contention that the court should have sua sponte given the jury a curative instruction. Counsel did not request any instruction. Moreover, the court instructed the jury prior to opening statements that the opening statements were not evidence. Rather, the prosecutor would present the State's contentions and outline what he expected to prove. The judge repeated the instruction in the final charge. This was the proper instruction, and nothing further was required of the court.

## B.

In turning to Point II, defendant asserts the trial court erred when it did not allow Heath to testify that he heard three other witnesses say they intended to lie when they gave their trial testimony. As stated, when Heath took the stand, he told the jury that the statement he gave to the police was "fabricated" and a "lie." Out of the presence of the jury, Heath said O'Brien and Dougher also fabricated their stories. He stated: "These guys told me that they were going to fabricate their stories because it wasn't true." In front of the jury, Heath continued to assert his prior statement was a lie, and he had never spoken to defendant about the December 23 events. He said:

> I was told that I could possibly go home. So, somebody told me that, so, I fabricated a story . . . because I know he had a major case. So, if I fabricated a story . . . then it could probably help me . . . . [I]t was a lie, and the other guys that did it also . . . [and] told me that I could do that.

Heath clarified that he was told by other inmates that if he lied it would help him to get out of jail. He was never told by police that cooperating with them would get him out of jail. And he did not get out of jail.

On cross-examination, defense counsel asked defendant whether he was in the same holding cell that morning in the courthouse with three other individuals who were also going to testify. Defendant responded, "Yes."

23

Counsel then asked: "Did they tell you . . . they were going to lie?"  The State objected.  At sidebar the court stated: "You can't testify to non-party statements that are out of court.  It's hearsay, unless you [have] an exception for me." Defense counsel responded that the testimony was permissible because "it's the fact that they're going to provide testimony that's false."  The judge sustained the objection.

On appeal, defendant argues this testimony—that other inmate witnesses intended to lie at trial—was admissible under N.J.R.E. 803(c)(25).  We defer to a trial court's evidentiary ruling absent an abuse of discretion.  State v. Garcia, 245 N.J. 412, 430 (2021) (citing State v. Nantambu, 221 N.J. 390, 402 (2015)).

Rule 803(c)(25), STATEMENT AGAINST INTEREST, says:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary, proprietary, or social interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid declarant's claim against another, that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true.  Such a statement is admissible against a defendant in a criminal proceeding only if the defendant was the declarant.

This hearsay "exception 'is based on the theory that, by human nature, individuals will neither assert, concede, nor admit to facts that would affect them unfavorably.'"  State v. Brown, 170 N.J. 138, 148-49 (2001) (quoting State v.

24

White, 158 N.J. 230, 238 (1999)).  A statement offered under this rule must be so far against the declarant's interest that a reasonable person in the declarant's position would not have made the statement unless they believed it to have been true.  See White, 158 N.J. at 238.

Defendant sought to introduce, through Heath, statements made by other trial witnesses that they intended to lie on the witness stand.  The testimony was indisputably inadmissible hearsay unless an exception permitted it.  See N.J.R.E. 801.

Defendant contends the applicable exception is Rule 803(c)(25).  We disagree.

First, the underlying rationale behind the hearsay exception is if the declarant's statement exposes the declarant to criminal liability, then the statement is deemed inherently trustworthy and reliable.  There was nothing trustworthy about Heath's or the other inmates' testimony.  Heath insisted his prior recorded statement given to police was entirely fabricated.  Given Heath's complete lack of cooperation, obstreperousness, and demeanor on the witness stand, the court could not conclude that anything he said was trustworthy or reliable.

Second, Heath's proffered testimony was that the jailhouse witnesses said they intended to lie when they gave their trial testimony, not that they had already lied. Therefore, the actual declarants of the statement—the jailhouse witnesses—had not yet exposed themselves to any criminal liability and their statements lacked the required indicia of trustworthiness. None of the witnesses said they lied to the police in their prior statements. The proffered testimony did not inculpate the declarants. It was at best a declaration of a future intent to lie. Defense counsel could have asked each witness whether they were lying when they were giving their trial testimony. Counsel did not do so.

In addition, the jury heard Heath say numerous times that he and two other witnesses lied to the police in their prior recorded statements in the hopes of getting an early release from jail. So the testimony was before the jury. We see no "clear error in judgment" in the court's ruling on this hearsay statement. State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

C.

We turn to Point III and consider whether the trial court interfered with Goodson's right to invoke his Fifth Amendment right to silence and counsel. At the start of Goodson's testimony, the prosecutor asked him, "[D]id you ever

26

share stories or talk to [defendant]"? Goodson replied that he wanted to "plead the fifth" and did not want to testify. The court ruled that Goodson could not assert the Fifth Amendment because he was asked to testify regarding information that did not incriminate him. The judge informed Goodson that answering questions about defendant's conversations with him did not infringe on Goodson's constitutional rights. In compelling Goodson to testify, the court cautioned him not "to testify to anything that specifically implicates you [in] a crime."

"The [F]ifth [A]mendment to the United States Constitution provides in part that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" State v. Hartley, 103 N.J. 252, 260 (1986) (citing U.S. Const. amend. V). The Fifth Amendment privilege is "firmly established as part of the common law of New Jersey and has been incorporated into our Rules of Evidence." Ibid. (citation omitted).

However, a trial judge is not required "to accept the witness' mere statement that the answer will tend to incriminate him." State v. Williams, 59 N.J. 493, 499 (1971) (citing State v. De Cola, 33 N.J. 335, 350 (1960)). Accordingly, a witness's claim of Fifth Amendment privilege may be overruled. Ibid.

Here, Goodson made a "naked claim of privilege" when he invoked his right to silence.  See Williams, 59 N.J. at 499.  He did not establish a reasonable basis for the privilege.  And the questions he was asked to answer did not offend the privilege.  The court did not err in compelling Goodson to testify.

Nor was it error for the court to decline Goodson's request to appoint an attorney for him.  As our Court has stated, the Fifth Amendment accords an accused person the right to counsel as a prophylactic measure to protect the accused from self-incrimination during police questioning, i.e., custodial interrogation.  State v. Sanchez, 129 N.J. 261, 266 (1992) (citing Miranda v. Arizona, 384 N.J. 436, 463-66 (1966)).  Goodson was not in custody, and he was not being questioned about a crime he was suspected of committing.  And as he was a witness, and not a charged defendant, the Sixth Amendment right to counsel was not applicable.  We see no reason to overturn the court's thoughtful ruling.

## D.

We briefly address Point V and find no merit in defendant's argument that the court erred when it provided the jury the "false-in-one, false-in-all" charge. Defendant contends it discredited his testimony.  We disagree.

The "false-in-one, false-in-all" charge instructs "that if the jurors find that any witness 'willfully or knowingly testified falsely to any material facts in the case, with the intent to deceive [them], [the jury] may give such weight to [the] testimony as [they] deem it is entitled.'" State v. Young, 448 N.J. Super. 206, 228 (App. Div. 2017) (citing Model Jury Charges (Criminal), "False-in-One False-in-All" (1991)). The charge was equally applicable to all witnesses.

Our Supreme Court has stated that a court has the discretion to give the charge when it "reasonably believes a jury may find a basis for its application." State v. Ernst, 32 N.J. 567, 583-84 (1960) (citation omitted). Given the nature of the various witness's testimony, the court had ample grounds to give the charge. Four witnesses testified that defendant confided in them that he attacked the victims. All were inmates hopeful of receiving some leniency on their jail sentences.

Heath gave a statement to police recounting a conversation with defendant in which defendant confessed to the murder and attempted murder. Before the jury, Heath recanted this statement, testifying that it was a fabricated story and a lie. Defendant testified that he did not commit the charged offenses and he was "shocked" and "surprised" when he later found out about the attack. There was more than ample evidence for the court to conclude that one or more of the

witnesses had attempted to mislead the jury. The trial court did not err in giving the instruction as the jury was charged with weighing the credibility of all of the witnesses.

E.

In Point VI, defendant asserts he was denied a fair trial because the State violated the court's sequestration order. Prior to opening statements, the judge inquired of counsel if they wanted sequestration of witnesses. Both attorneys replied, "Yes." There was no further discussion of the details of the order.

As stated, Heath testified that the jail house witnesses were kept in the same holding cell in the courthouse on the day they testified. Goodson also stated he was in a holding cell with other jail witnesses, but they did not talk about their testimony. He later said the others were talking about the case, but he only listened. Defendant did not object to the circumstances regarding the inmate witnesses. Therefore, we review his assertion for plain error. R. 2:10-2.

The purpose of sequestering witnesses during trial "is to discourage collusion and expose contrived testimony." Morton Bldgs., Inc v. Rezultz, Inc., 127 N.J. 227, 233 (1992) (citation omitted). The sequestration of witnesses during trial prevents a prospective witness from becoming biased by hearing the

30

testimony of a witness who testifies before them.  State v. Williams, 404 N.J. Super. 157, 160 (App. Div. 2008) (quoting State v. DiModica, 40 N.J. 404, 413 (1963)).  Even where a trial court's sequestration order is inadvertently violated, this does not trigger an automatic exclusion of the witness's testimony "[a]bsent a clear showing of prejudice."  Ibid.

Because defendant did not object to the jail witnesses' testimony on the grounds that a sequestration order was violated, we cannot know whether a violation occurred.  The order usually prevents a witness from hearing another witness's testimony—not from being held in the same jail cell with other witnesses while waiting to testify.  There were no specific details provided to this court regarding the sequestration order.  In addition, none of the witnesses were present when another was testifying.  Moreover, defense counsel did not ask any of the witnesses if they had discussed their testimony with others who had testified before them.  And there was no evidence that any witnesses discussed their testimony after they testified at trial.

Even if the sequestration order was violated, a court might only exclude the witness's testimony if there is a clear showing of prejudice.  Defendant has not explained how he was prejudiced by the witnesses being housed in the same

31

courthouse holding cell prior to testifying. Defendant has not demonstrated plain error.

F.

Under Point VIII, defendant asserts the trial court erred in denying his motion for a new trial or, in the alternative, defendant urges this court to find trial counsel was ineffective by failing to adequately investigate the case. We find no merit in these arguments and affirm substantially for the reasons given by the trial court in its oral decision denying the motion for a new trial.

First, it is not appropriate for defendant to raise an ineffective assistance of counsel claim on a direct appeal. Ineffective assistance of counsel claims are better suited in a post-conviction relief petition under Rule 3:22-2 because "such claims often cannot reasonably be raised on direct appeal." State v. McQuaid, 147 N.J. 464, 484 (1997). Our courts have "a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the record." State v. Preciose, 129 N.J. 451, 460 (1992).

As to the motion for a new trial, defendant asserted he had newly discovered evidence that entitled him to a new trial. The judge analyzed the

32

newly proffered evidence under the Carter[4] factors and found it was not material and could have been discovered with reasonable diligence prior to the trial.

Whether to grant a motion for a new trial is within the discretion of the trial judge. State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)). We will not interfere with the trials court's decision absent an abuse of discretion. Ibid. (quoting Russo, 333 N.J. Super. at 137). A trial court's decision as to defendant's motion for a new trial "shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law." Id. at 305 (citing R. 2:10-2).

The trial judge conducted an analysis of the newly proffered evidence under the Carter factors. His decision was well-reasoned. We see no manifest denial of justice or abuse of discretion in the court's decision to deny the motion for new trial.

## G.

We lastly address defendant's contentions regarding his sentence. He asserts the trial court erred in failing to apply mitigating factors three, four and five, N.J.S.A. 2C44-1(b)(3) to (5). He further contends that the imposition of consecutive sentences was manifestly unfair and excessive.

---

[4] State v. Carter, 85 N.J. 300, 314 (1981).

We review defendant's sentence for an abuse of discretion. State v. Jones, 232 N.J. 308, 318 (2018). We will not substitute our judgment for that of the sentencing court. State v. Fuentes, 217 N.J. 57, 70 (2014) (citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). Instead, we will affirm the sentencing judge's decision so long as the sentence does not "shock the judicial conscience" and the aggravating and mitigating factors are identified and "supported by competent, credible evidence in the record, and properly balanced." State v. Case, 220 N.J. 49, 65 (2014) (first quoting State v. Roth, 95 N.J. 334, 365 (1984); then citing State v. Natale, 184 N.J. 458, 489 (2005)).

We see no abuse in the imposition of sentence. The court considered the aggravating and mitigating factors and gave reasons for its decision. The sentence was supported by the "competent, credible evidence in the record." Case, 220 N.J. at 65.

In addition, after reviewing the Yarbough[5] factors, the court concluded the murder and attempted murder sentences should run consecutively. The court found the murder of Hunter and attempted murder of Ebony were separate criminal acts of violence. The judge stated that defendant perpetrated each crime as a "separate and distinct act against a different victim" and these "evils

---

[5] 100 N.J. 527, 643-44 (1985).

require separate punishment as there can be no free crimes." The judge did not abuse his discretion in applying the <u>Yarbough</u> factors.

To the extent we have not commented on Points IV, VII, and IX, and any further arguments raised by defendant, we find they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION