<div style="border:1px solid black; text-align:center;">

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

</div>

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2306-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CORNELL R. TARTE, a/k/a
CORNELL R. TORTE, and
KASAUN B. TART,

    Defendant-Appellant.

_____

          Submitted May 21, 2025 – Decided August 29, 2025

          Before Judges DeAlmeida and Puglisi.

          On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 21-01-0144.

          Jennifer N. Sellitti, Public Defender, attorney for appellant (Gilbert G. Miller, Designated Counsel, on the brief).

          Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Jason Magid, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After a jury trial, defendant Cornell R. Tarte appeals from the March 24, 2023 judgment of conviction for first-degree murder, N.J.S.A. 2C:11-3(a)(1); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1); and his sixty-three-year prison term with an eighty-five percent parole ineligibility term pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. He also challenges the January 20, 2022 order denying his motion to suppress evidence obtained pursuant to a search warrant.

Defendant raises the following two points for our consideration:

POINT I

THE WARRANT AUTHORIZING THE SEARCH OF THE CELL PHONE SEIZED FROM DEFENDANT'S POCKET THREE WEEKS AFTER THE HOMICIDE VIOLATED THE FEDERAL AND STATE CONSTITUTIONS, BECAUSE THE WARRANT WAS NOT SUPPORTED BY PROBABLE CAUSE, AND IT WAS NOT SUFFICIENTLY LIMITED IN SCOPE.

POINT II

DEFENDANT WAS ENTITLED TO A NEW TRIAL, BECAUSE THE PROSECUTOR IMPROPERLY URGED THE JURY ON SUMMATION TO RECALL DEFENDANT'S SHORT HEIGHT AS HE STOOD IN THE COURTROOM EACH DAY; TO COMPARE

THIS ASSESSMENT WITH THE HEIGHT OF THE ASSAILANT AND THE KNOWN HEIGHT OF THE VICTIM AS EACH WERE DEPICTED STANDING AGAINST THE VICTIM'S DODGE, AND TO "LOOK UP" THE ACTUAL HEIGHT OF A DODGE AS A FIXED REFERENCE POINT.

We affirm.

I.

We recite the following facts from the Camden County Prosecutor's Office (CCPO) detective's certification in support of the State's application for a search warrant for defendant's cellphone.

On September 7, 2020, at 11:58 p.m., the Camden County Police Department-Metro Division received a 911 call reporting an individual, later identified as Michael Milton,[1] was found shot inside his vehicle in the parking lot of a gas station on Kaighn Avenue in Camden. The caller advised that someone, later identified as Michael's brother Eugene, was driving Michael to the hospital.

When responding officers arrived at the hospital, they located Michael's vehicle, a Dodge Challenger, parked in front of the emergency room entrance. Eugene told the officers he received a phone call informing him something was

---

[1] Because the victim and his brother share a common surname, we refer to them by their first names with no disrespect intended.

wrong with Michael. Upon Eugene's arrival at the gas station, he found Michael unresponsive in the driver's seat of his vehicle, pushed him into the passenger's seat, and drove him to the hospital. Michael was treated for a gunshot wound to the left side of his head but succumbed to his injuries the next day.

The CCPO investigated the homicide. Detectives secured the Challenger, obtained a search warrant, and processed the vehicle. They did not locate Michael's cellphone at the gas station or in the vehicle.

Detectives also reviewed surveillance camera footage in the vicinity of the gas station. A real-time tactical operations intelligence center (RT-TOIC) camera was located in proximity to the gas station. The RT-TOIC video footage showed Michael's vehicle enter the gas station parking lot at approximately 11:11 p.m. on September 7, 2020. Michael exited the vehicle and walked into the gas station's convenience store, then returned to his vehicle and got in the driver's side door about five minutes later.

The RT-TOIC video footage also showed a red SUV, later identified as belonging to defendant's girlfriend Jabria Shields, enter the gas station parking lot from Mount Ephraim Avenue at approximately 11:13 p.m., while Michael was in the convenience store. The SUV then exited the parking lot and turned left onto Mount Ephraim Avenue.

A-2306-22

About four minutes later, an individual wearing a white t-shirt, an outer garment detectives believed was a jacket, dark pants with white stripes and dark shoes, crossed Mount Ephraim Avenue toward the gas station. Approximately ten seconds after Michael got back into his vehicle, the individual approached the driver's side window.

Video footage from a nearby liquor store, along with the RT-TOIC video, showed a flash of light consistent with the muzzle flash of a firearm at 11:17 p.m. A local ShotSpotter system also captured the sound of a gunshot at that time. After the flash, the individual leaned into the driver's side window of Michael's vehicle before walking away shortly after 11:18 p.m. Michael's vehicle remained in the parking lot with its brake lights on for about forty minutes until Eugene arrived and drove it away.

After identifying Shields's vehicle as being in the area of the homicide, detectives backtracked its location earlier that day. An automated license plate reader system identified the vehicle at Ferry and Mount Ephraim Avenues at approximately 3:40 p.m., and detectives tracked it on video to a liquor store on Kaighn Avenue. The liquor store video showed an individual exit Shields's vehicle and enter the store wearing a white t-shirt with a logo containing the words "PAID IN FULL" on the front, light shorts, and black shoes.

A-2306-22

Video footage from outside a second liquor store in Camden showed Shields's vehicle park across from that store at approximately 10:44 p.m. A male exited the driver's side and walked toward the liquor store. The store's interior cameras showed the male was dressed in the same white t-shirt with a "PAID IN FULL" logo, dark pants with two white stripes, and black shoes. The male exited the store a short time later and returned to Shields's vehicle, then left around 10:51 p.m. Still images of the male in the videos were sent to the Camden County Sheriff's Office for facial recognition, which identified defendant as a possible match.

Detectives also obtained a communications data warrant for Michael's cellphone number. The phone records showed Michael received an incoming call about five minutes before he was shot. A detective called that number and an unidentified male answered the phone. The detective had a drug-related conversation with the male and arranged to purchase controlled dangerous substances from him, but ultimately the meetup did not occur. Detectives were unable to determine the identity of the unknown male or owner of the phone number.

A week after the homicide, detectives conducted a recorded interview of Shields. She stated she drove defendant to the gas station the evening of the

A-2306-22

homicide to buy marijuana from an individual she called "the weedman." Shields said that when they pulled into the parking lot, she called the weedman using a cell phone left in her vehicle by defendant's friend. After the call, Shields exited the gas station parking lot and parked on Mount Ephraim and Sycamore Avenues. She said defendant exited her car to walk back to the gas station and meet the weedman, and she then turned right onto Sycamore Avenue and parked near a train trestle. When defendant returned to her vehicle, they drove to Millville, picked up her mother, and went to Atlantic City.

When the detectives showed Shields still images and video from the RT-TOIC and liquor store cameras, she identified the individual wearing the "PAID IN FULL" logo t-shirt as defendant and acknowledged it was her vehicle in the gas station parking lot just prior to the homicide. When shown the RT-TOIC video depicting the individual in dark pants with white stripes approach Michael's vehicle shortly after 11:17 p.m. and then walk away a minute later, Shields said she was unsure if it was defendant but acknowledged he was wearing dark pants with white stripes and a jacket that evening. She also acknowledged that the time defendant exited her vehicle matched the timeframe of when the individual was seen walking to the gas station. She admitted she

7

did not see anyone else in the video that could have been defendant, given the style of pants he was wearing.

Three days after her initial interview, Shields contacted a detective to advise she had a bag containing defendant's clothing from the night of the homicide. She subsequently met with CCPO detectives and gave them a bag containing black pants and a jacket, explaining that defendant changed his clothes in her car the night of the homicide. Later testing of the bag's interior yielded a presumptive positive result for gunshot residue, and a stain on the jacket yielded a presumptive positive result for blood.

Upon examination, detectives noted the pants had three white stripes and an Adidas logo, but the pants worn by the individual in the videos had two white stripes and no visible logo. They also noted Shields gave them a black Nike jacket with no hood. Based on the inconsistencies between the clothing in the videos and the clothing Shields provided, detectives re-interviewed her.

In Shields's second consensual recorded interview, detectives showed her four still images of the individual at the liquor store, whom she identified as defendant, and confronted her with the inconsistency in the appearance of the pants. Shields repeatedly maintained defendant had only one pair of that style pants, and they had two white stripes. She stated defendant had changed his

clothing in her vehicle multiple times before, but remained adamant that the pants she gave detectives, which had three stripes, were from the night of the homicide.

On September 28, 2020, federal marshals arrested defendant on an unrelated outstanding bench warrant and detained Shields for questioning. A search incident to defendant's arrest yielded a cellphone in his pants pocket, which was retained pending the issuance of a search warrant.

After defendant waived his Miranda[2] rights, detectives conducted a video recorded interview of him. Defendant identified himself in still images extracted from both liquor stores' surveillance videos, and acknowledged he and Shields drove to the gas station to buy marijuana the night of the homicide. He denied he was the individual seen on video approaching Michael's vehicle at the gas station, claiming he was nearby on Kaighn Avenue at that time.

Defendant provided a different account than Shields. He explained that Shields parked at the corner of Mount Ephraim and Sycamore Avenues and she exited the car to urinate. He claimed he then "dipped" to try to meet another woman who lived on Kaighn Avenue. Defendant claimed he was on his way to

_____

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

the other woman's residence but Shields drove around the corner and picked him up on Kaighn Avenue before the train trestle.

In her third recorded interview, Shields told detectives that she dropped off defendant near Mount Ephraim and Kaighn Avenues. She stated she later picked him up on the street past the train trestle, not on Kaighn Avenue as defendant claimed.

Defendant was charged with murder and weapons offenses. Based on the foregoing information, the CCPO applied for a search warrant for defendant's cellphone on December 7, 2020, which was granted the same day. The search warrant permitted seizure of the cellphone, including:

> the assigned telephone facility phone number, any subscriber information, local and long distance calls, contact(s) and or contact lists, phonebook and stored contact information, both sent and received text messages (SMS and MMS) including content of text messages and photographs sent or received via text message, photographs stored on the phone, video and stored media data and any other stored electronic data including GPS, stored applications and internet browsing history, IMEI and other unique identifying serial numbers.

The search warrant further authorized seizure of:

> stored and/or deleted incoming and outgoing calls, contact lists, [e]-mails, text messages, pictures, subscriber information, method of billing and payment, call logs, video or any other data originating from and

received by the target cellular phone as well [as] all data in the installed applications on the device, and data stored on cloud storage associated with the installed applications on the device. Said evidence shall also include the following[:]

a. <u>Decoded Data</u>: call logs; voicemails; contact lists; locations (WiFi networks, cell tower IDs and GPS fixes); images; text messages (SMS); MMS; emails; notes; installed applications and their usage; user dictionary; calendar; and Bluetooth devices pairing history.

b. <u>GPS</u>: including, but not limited to home location, favorites and recently found on Applications and/or programs such as Google; Google maps; iPhone; Garmin; and TomTom.

c. <u>Internet Browser</u>: Safari (bookmarks, searches, history and cookies), Chrome (bookmarks, searches, history and cookies).

d. <u>Cloud Data</u>: This search is for the aforesaid evidence contained within the physical device and does authorize law enforcement to remotely access and search for aforesaid evidence within the remote cloud service account(s) found to have been utilized by the above described mobile devices.

The search warrant also granted permission "to access files that have been 'hidden,' erased, compressed, password protected, coded or encrypted, to obtain evidence of the crime of [m]urder pursuant to N.J.S.[A.] 2C:11-3."

A search of the cellphone revealed it was activated two days after the murder. A data extraction uncovered three photographs of a Ruger handgun and

11

9mm magazine, which had been taken with the cellphone camera on September 23, 2020. In March 2021, a 9mm Ruger handgun was recovered in an adjacent county. Ballistics testing confirmed a 9mm shell recovered at the homicide crime scene matched those fired from the recovered handgun.

Defendant filed a pretrial motion to suppress the photographic evidence seized from the cellphone, arguing the warrant was unsupported by probable cause and overbroad because it authorized a search of the phone without limitation. Judge David M. Ragonese denied the motion by order dated January 20, 2022.

In a comprehensive twenty-page opinion, Judge Ragonese detailed the foregoing facts contained in the certification in support of the search warrant, discussed governing case law, and determined the totality of the circumstances supported a finding of probable cause. The judge rejected defendant's contention probable cause was stale, noting the facts remained unchanged three months after the murder. With regard to defendant's challenge to the particularity and breadth of the search warrant, the judge surveyed case law from other jurisdictions and concluded the warrant met constitutional particularity requirements because it "was explicitly limited to the specific offense being investigated . . . and did not authorize intrusion into unrelated matters."

At trial, the State presented testimony from the lead CCPO detective. The detective identified the recovered handgun and pointed to rusting behind the trigger, a grooved area on the back of the slide, and a wear mark at the front of the slide. He testified he observed similar rusting and a wear mark in the same areas on the handgun depicted in two photographs on defendant's cellphone.

## II.

During the prosecutor's closing argument, he remarked:

> You can also see for yourself from the video the killer's physical stature matches the defendant and what I mean is we know based on the autopsy, and based on testimony from the crime scene, that Michael Milton, the victim, was measured to be approximately sixty-eight inches which is about five feet, eight inches.

> You can look at the video and you can see the victim as he is standing near the green Dodge Challenger before he enters the car and you can judge his height and compare it to someone else in relation to that static object right there, all right?

> You can see where Mike Milton's head is in relation to the roof of the green Dodge Challenger versus where the killer's head is on that roof. You'll also see that when the shooter approaches and is standing in the same location where Mike Milton was before he got in you will be able to see a significant difference in height, that the killer is shorter than five foot, eight [inches].

> And you've seen for yourself during the course of the trial while in court when the defendant has stood as

you have entered and exited the courtroom that he is not even close to being five foot, eight [inches]; he's much shorter just like the shooter was.

Later in his summation, the prosecutor commented:

So again, in relation to the height of the Challenger, I can't tell you—I can't sit here and tell you how high a Challenger comes up to, I actually don't know. You can probably look it up, that's not in evidence at this point in time, but what we do [know] is it's a static object.

It's sitting right there. All right? The next exhibit, State's Exhibit 104. This is Mike Milton, still alive right before he got into his vehicle.

Just take a look for yourself how high his head comes to assuming that he's at a minimum five [foot] eight [inches]. So I imagine an autopsy does not make—is not putting the person standing against a [w]all, take that five [foot], eight [inches], no shorter than five [foot], eight [inches].

His brother I think maybe put him around (indiscernible). I were [sic] just to go toggle back and forth between these two photos, again, the image with the defendant, the State is alleging is the defendant, the evidence establishes it is the defendant, but again, notice the white stripe pants on that image and then we go to the victim on the next image.

It's a difference and the difference is the killer is shorter than five [foot], eight [inches]. . . .

During deliberations, the jury forwarded the judge a note with three questions, one of which asked, "What year was the Challenger?" In response to this inquiry, the judge instructed the jury:

> The first [question] was what year was the Challenger. Now, there is no evidence in the trial of the year of the Challenger, so you are not to consider any evidence that wasn't admitted at the trial and nor should you speculate about any evidence that wasn't admitted at the trial.
>
> And I will remind you once again, the instruction I've given you since the beginning of the trial, even before we started when you were being selected, you are not to conduct any independent research to find out the year of this [Challenger]. Or any issue that you come across that you had a question about. You're not to conduct any research whatsoever.

Following the guilty verdict, defendant moved for a new trial based on the prosecutor's reference to his height and Michael's vehicle during closing arguments. Defendant argued the prosecutor's description of him as "short," based on a comparison to the height of Michael's vehicle, was improper because neither defendant's height nor the vehicle's height was presented in evidence. Defendant further contended the prosecutor's suggestion to the jury that they could "probably look it up" impermissibly invited jurors to conduct independent research.

15

The trial judge denied defendant's motion for a new trial, concluding that neither the prosecutor's comments during closing arguments nor the jury's purported focus on the height comparison constituted a manifest denial of justice. The judge found the prosecutor's description of defendant as "short" was not egregious and was based on evidence already admitted, such as video footage where the jury could compare defendant's size to other objects and individuals. The judge further explained that the State's comparison of defendant's courtroom appearance, as observed by the jurors, with the video surveillance in evidence was consistent with notions of a fair trial. The judge also found the prosecutor's comments were a fair response to defendant's challenge to the State's identification of him as the suspect.

Regarding the prosecutor's suggestion to the jurors they look up the height of the vehicle, the judge concluded this fleeting comment, even if improper, did not directly influence the jury's decision, particularly given the substantial and independent evidence of guilt, including videos, forensic evidence, and testimony. In rejecting defendant's contention the jury conducted independent research, the judge noted he gave clear instructions throughout the trial and in response to the jury's question, and presumed the jury adhered to these

instructions. Thus, the judge concluded the prosecutor's comments did not deprive defendant of a fair trial.

III.

We first address defendant's appeal from the court's order denying his motion to suppress the photographs obtained from his cellphone as authorized by the search warrant. Our federal and state constitutional jurisprudence favors searches conducted pursuant to a search warrant, requiring the State to set forth detailed information to a neutral magistrate establishing a showing of probable cause. State v. Evers, 175 N.J. 355, 381 (2003); State v. Marshall, 123 N.J. 1, 71 (1991). A search warrant not supported by probable cause is deemed unreasonable and is prohibited by the Fourth Amendment. Marshall, 123 N.J. at 71.

Our review of the legal propriety of the issuance of a search warrant "accord[s] substantial deference to the discretionary determination resulting in the issuance of the warrant." Id. at 72. Stated differently, reviewing courts grant substantial deference to a judge's finding of probable cause to issue a search warrant. Evers, 175 N.J. at 381.

If the court has any "[d]oubt as to the validity of the warrant," such doubt "should ordinarily be resolved by sustaining the search." State v. Keyes, 184

N.J. 541, 554 (2005) (quoting State v. Jones, 179 N.J. 377, 389 (2004)).  Courts have long held "a search executed pursuant to a warrant is presumed to be valid and that a defendant challenging its validity has the burden to prove 'that there was no probable cause supporting the issuance of the warrant or that the search was otherwise unreasonable.'"  Jones, 179 N.J. at 388 (quoting State v. Valencia, 93 N.J. 126, 133 (1983)).

"When reviewing a trial court's decision to grant or deny a suppression motion, appellate courts '[ordinarily] defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record.'"  State v. Smart, 253 N.J. 156, 164 (2023) (alteration in original) (quoting State v. Dunbar, 229 N.J. 521, 538 (2017)); see also State v. Kasabucki, 52 N.J. 110, 116 (1968) ("[W]hen the adequacy of the facts offered to show probable cause is challenged after a search made pursuant to a warrant, and their adequacy appears to be marginal, the doubt should ordinarily be resolved by sustaining the search.").  "But when the facts are undisputed . . . and the judge interprets the law on a non-testimonial motion to suppress, [an appellate court's] review is de novo."  Smart, 253 N.J. at 164.

"Both the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution provide in nearly identical

language that 'no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.'" State v. Marshall, 199 N.J. 602, 610 (2009) (quoting N.J. Const. art. I, ¶ 7). And "as technological advance introduce[s] '[s]ubtler and more far-reaching means of' privacy invasion, the judiciary is obligated 'to ensure that [advance] does not erode Fourth Amendment protections.'" State v. Missak, 476 N.J. Super. 302, 316 (App. Div. 2023) (alterations in original) (citing Carpenter v. United States, 585 U.S. 296, 320 (2018)).

A valid warrant requires "probable cause to believe that a crime has been committed, or is being committed, at a specific location or that evidence of a crime is at the place sought to be searched." State v. Sullivan, 169 N.J. 204, 210 (2001); see also State v. Chippero, 201 N.J. 14, 28 (2009) (explaining there must be "substantial evidence" supporting a court's probable cause determination "the items sought are in fact seizable by virtue of being connected with criminal activity, and . . . the items will be found in the place to be searched") (quoting 2 Wayne R. LaFave, Search and Seizure § 3.1(b) (4th ed. 2004)).

"Probable cause for the issuance of a search warrant requires 'a fair probability that contraband or evidence of a crime will be found in a particular

place.'" Chippero, 201 N.J. at 28 (quoting United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993)). "[T]he probable cause determination must be . . . based on the information contained within the four corners of the supporting affidavit, as supplemented by sworn testimony before the issuing judge that is recorded contemporaneously." Marshall, 199 N.J. at 611 (quoting Schneider v. Simonini, 163 N.J. 336, 363 (2000)). This is because "the scope of a lawful search is 'defined by the object of the search and the places in which there is probable cause to believe it may be found.'" Ibid. (quoting Maryland v. Garrison, 480 U.S. 79, 84 (1987)).

With these governing standards in mind, we are satisfied the CCPO detective's certification provided sufficient facts supporting a finding of probable cause to search the cellphone. Surveillance video showed the crime scene and surrounding areas, and the interviews of Shields and defendant provided additional corroborating information. Minutes prior to Michael being shot in his vehicle, defendant and Shields entered the same parking lot and made a phone call from an unrecovered phone. While the caller's identity was unknown, Michael received a call at approximately the same time.

In addition, the clothing worn by the perpetrator matched defendant's clothing he wore earlier that day. And although Shields's story changed and was

20

inconsistent with defendant's version, they both admitted that after leaving the gas station parking lot, they parked nearby and defendant exited the vehicle around the same time as the perpetrator walked to the gas station and shot Michael. We also note that defendant had already been charged with murder at the time the CCPO applied for the search warrant of his cellphone.

We are unpersuaded by defendant's contention the information contained in the detective's certification was speculative or unsupported, as it reflected the information captured on video along with statements and admissions made by Shields and defendant. We are also unconvinced by defendant's argument the application lacked a sufficient nexus between the cellphone and the crime.

Contrary to defendant's contentions, the judge reviewing the warrant application was not required to accept all Shields's statements as true. Rather, the State was entitled to reasonable inferences which, considered in light of Shields's inconsistencies and contradictions with defendant's statements, established probable cause for the search of defendant's cellphone.

Defendant also challenges the scope of the search warrant as overbroad, arguing it impermissibly permitted an unrestricted search of all data on the phone without adequate justification and did not include any date or time limitations on the search. We are unpersuaded because the search warrant did

not authorize an unfettered search of the entire cellphone. Rather, it limited the search's scope to evidence of the murder which, as the judge noted, could be found in many different areas of a cellphone:

> The warrant in this case constrained the search of defendant's phone to evidence of the specific crime of first[-]degree murder. The affidavit in support of the warrant described in detail the facts that led law enforcement to suspect that defendant murdered [Michael]. At the time the cell phone was seized, the officers could not have known where evidence of the murder was located in the phone or in what format, such as texts, videos, photos, emails, or applications.
>
> Furthermore, the warrant authorizing the search did not contain such unqualified language that would permit the search of the cell phone for any other information. Instead, the warrant listed . . . specific areas to be searched within the cell phone[.] . . . Under the circumstances, the scope of the warrant was sufficiently particular and was not overbroad because it did not permit the "general, exploratory rummaging" that the particularity requirement was designed to prevent. . . .

IV.

We next turn to defendant's challenge to the prosecutor's closing argument, which he contends entitled him to a new trial. "[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse [of discretion] has been shown." State v. Armour, 446 N.J. Super. 295, 306 (App.

Div. 2016) (first alteration in original) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)).  "A trial court's ruling on a motion for a new trial 'shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law.'"  Id. at 305 (quoting R. 2:10-1).

Rule 3:20-1 provides a "trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice."  However, "the trial judge shall not set aside a jury verdict unless 'it clearly and convincingly appears that there was a manifest denial of justice under the law.'"  Armour, 446 N.J. Super. at 305-06 (quoting R. 3:20-1).

Defendant argues the prosecutor improperly urged the jury to recall defendant's "short height" as observed in the courtroom, comparing it to Michael's and the perpetrator's statures depicted in surveillance footage, and suggesting the jury look up the height of the Challenger as a reference point.  He contends these remarks introduced facts not in evidence, relied on the prosecutor's personal assessment of defendant's height, and invited the jury to engage in impermissible factfinding on matters outside the trial record.

Defendant further contends these remarks were highly prejudicial and significantly affected the jury's determination of identity, given the lack of strong evidence linking him to the crime.  He maintains the prosecutor's focus

23

on his non-testimonial appearance violated his Fifth Amendment rights by implicitly permitting the jury to draw an inference against him.

We note that prosecutors are granted flexibility to "make vigorous and forceful closing arguments to juries," but must "stay[] within [the scope of] the evidence and the legitimate inferences therefrom." State v. Clark, 251 N.J. 266, 289-90 (2022) (quoting State v. Williams, 244 N.J. 592, 607 (2021)). Having reviewed the record in light of our deferential standard of review, we are unconvinced the trial judge abused his discretion in denying defendant's motion for a new trial. The prosecutor's comments regarding defendant's height, as observed by the jurors in the courtroom and in comparison to the videos in evidence, did not run afoul of notions of fundamental fairness. Defendant's identification as the perpetrator of the murder was the key issue at trial, a determination the jurors were instructed was theirs alone to make. The judge also reminded the jurors to consider only the evidence in the case, which did not include counsel's argument.

In addition, we are unpersuaded the prosecutor instructed the jurors to conduct independent research; his comment they "can probably look it up" was immediately followed by the statement "that's not in evidence." And to the extent the jurors could have misconstrued the comment as an invitation to

24

conduct research, any error was cured by the judge's consistent instructions and specific response to the jury's question. As the trial judge found, the errant statement may have been improper, but it was a fleeting comment that did not appear to influence the jury's decision, given the weight of the State's evidence against defendant. Thus, we discern no abuse of discretion in the trial judge's denial of defendant's motion for a new trial.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2306-22